**POLYCAST TECHNOLOGY CORPORATION, Plaintiff,**

v.

**UNIROYAL, INC., CDU Holding, Inc., Joseph P. Flannery, John R. Graham, Alexander R. Castaldi, Donald L. Nevins, Jr., Robert Alvine, Alfred Weber, Clayton & Dubilier, Inc., Clayton & Dubilier Private Equity Limited Partnership, Clayton & Dubilier Associates Limited Partnership, Martin H. Dubilier, Joseph L. Rice III, and Alan R. Elton, Martin H. Dubilier, Joseph P. Flannery, John**

**R. Graham, and Joseph L. Rice III as Trustees of CDU Holding, Inc. Liquidating Trust, Defendants.**

**Alfred WEBER, Counterclaim–Plaintiff,**

v.

**POLYCAST TECHNOLOGY CORPORATION and Uniroyal Plastics Company, Inc., Counterclaim–Defendants.**

No. 87 Civ. 3297 (JMW).

United States District Court, S.D. New York.

Nov. 21, 1989.

John H. Hall, Daniel M. Abuhoff, Debevoise & Plimpton, New York City, for defendants.

Carey Ramos, Paul, Weiss, Rifkind, Wharton & Garrison, Sidney Stein, Stein, Zauderer, Ellenhorn, Frischer & Sharp, New York City, for plaintiff.

Andrew Goldwater, Friedman & Kaplan, New York City, for counterclaim-plaintiff.

## OPINION

WALKER, District Judge:

This dispute arises from the allegedly fraudulent sale by defendant Uniroyal, Inc.

("Uniroyal") of its wholly owned subsidiary Uniroyal Plastics Company, Inc. ("Plastics") to plaintiff Polycast Technology Corporation ("Polycast"). In substance, Polycast alleges that in valuing and pricing the shares of Plastics and in consummating the transaction, it relied on materially misleading information furnished by defendants with respect to the financial status, earnings potential, and operating condition of Plastics, and that as a result it paid a grossly excessive price for the stock.

In four claims, the defendants are charged variously with violations of Rule 10b–5 promulgated under section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act"), section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2) and common law fraud. In this motion, defendants Martin H. Dubilier, Joseph L. Rice III, Clayton & Dubilier, Inc., The Clayton & Dubilier Private Equity Fund Limited Partnership ("Private Equity") and Clayton & Dubilier Associates Limited Partnership (C & D Associates) (collectively, the "C & D Defendants"), who are charged as both principals and aiders and abettors, move to dismiss the § 10(b) and common law claims against them for failure to plead fraud with particularity pursuant to Fed.R.Civ.P. 9(b) and to dismiss the § 12(2) claims for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6).

Also Polycast moves for leave to file an amended complaint ("Proposed Fourth Amended Complaint") adding a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), to add Uniroyal Plastics Acquisition Corp ("UPAC") as a plaintiff, and to make certain additional changes. The C & D defendants have requested an order dismissing the First through Fifth Claims of the Proposed Fourth Amended Complaint should the Court grant Polycast's motion for leave to file an amended complaint.

Defendant and counterclaim-plaintiff Alfred Weber has moved to dismiss counterclaim-defendant Plastics' first amended counterclaims for failure to plead fraud with particularity, and for failure to state a claim upon which relief may be granted.

I. *Defendants' Motion to dismiss Counts One through Four of the Third Amended Complaint*

### A. BACKGROUND

The Court presumes familiarity with its prior opinion, *Polycast Technology Corp. v. Uniroyal, Inc.* [Current] Fed.Sec.L.Rep. (CCH) ¶ 94,005, 1988 WL 96586 (S.D.N.Y. Aug. 25, 1988), and summarizes only the salient and additional facts here. On August 25, 1988, this Court dismissed, with leave to amend, Polycast's claims against the C & D defendants under federal securities and common law for failure to plead fraud with particularity. Subsequently, Polycast filed an amended complaint ("Third Amended Complaint"). The C & D defendants now move to dismiss certain claims of the Third Amended Complaint on the same grounds. For the reasons set forth below, this motion is denied.

It is well settled that on a motion to dismiss, the Court must accept the allegations of the complaint as true. *Luce v. Edelstein,* 802 F.2d 49, 52 (2d Cir.1986). The complaint identifies C & D as an investment banking firm owned at all times relevant to this action by its Chairman, Martin Dubilier and Chief Executive Officer Joseph Rice. Both men were directors of Uniroyal and CDU Holding, Inc. Rice and Dubilier are also general partners of C & D Associates which is a general partner of C & D Private Equity ("Private Equity"). Private Equity is a limited partnership managed by C & D. As of the liquidation of Uniroyal and its parent, Private Equity allegedly owned all of the outstanding Class C common stock, or 32.5% of the then outstanding stock of CDU Holding, Inc. In addition, from September 24, 1985 until the liquidation of CDU Holding, Inc. on December 2, 1986, Private Equity owned all of the outstanding shares of Uniroyal's Second Preferred stock. CDU Holding, Inc., owned all of Uniroyal's common stock throughout 1986 until Uniroyal and CDU Holding, Inc. were liquidated on December 2, 1986. Third Amended Complaint at ¶¶ 6, 18–26.

In September 1985, pursuant to an agreement signed by Rice as President of CDU Acquisition, Inc. and CDU Holding, Inc. and an unspecified signatory on behalf of Uniroyal, Uniroyal merged with CDU Acquisition, Inc., a wholly owned subsidiary of CDU Holding. As a result, CDU Holding acquired all of Uniroyal's common stock. C & D Private Equity owned 32.5% of the common stock of CDU Holding, Inc., and 260,000 shares of Uniroyal redeemable second preferred stock. The complaint alleges that after the merger was complete, the C & D defendants, among others, embarked upon a plan to liquidate Uniroyal and pay the bulk of the proceeds to themselves. As part of that plan, they commenced preparations for the sale of Plastics.

The complaint alleges, in essence, that throughout the preparations and negotiations leading to Polycast's purchase of Plastics, the C & D defendants, among others, repeatedly misrepresented Plastics' financial health and prospects, particularly Plastics' 1986 estimated earnings.

Polycast claims the C & D defendants' role in the deception began in December 1985 when they began preparing the allegedly fraudulent offering memorandum upon which Polycast relied in purchasing Plastics and continued until the sale of Plastics closed on October 31, 1986. Specifically, Polycast alleges that on December 3, 1985, Rice and Dubilier received a draft offering memorandum from Drexel Burnham Lambert Incorporated ("Drexel") acting as investment bankers for C & D and Uniroyal in connection with the sale of Plastics. On December 5, 1985, Dubilier and Peter Dolle of C & D met with employees of Uniroyal, Plastics and Drexel at C & D's offices to discuss the sale. Polycast alleges that at the meeting, Dubilier, Dolle and others reviewed the draft offering memorandum and discussed a 1986 earnings projection of $24 million that would appear in the offering memorandum. *Id.* at ¶ 40. Polycast also alleges that notes taken by defendant Donald L. Nevins at the meeting contain the phrase "need 600 more in EBIT [earnings before taxes]." Polycast interprets these words as reflect-

ing discussion at or immediately following the meeting that the $24 million earnings projection contained at least $600,000 in known earnings shortfall. *Id.*

In a February 1986 meeting, Drexel gave C & D representatives a list of potential bidders who would be offered the opportunity to review the Plastics offering memorandum. Polycast alleges that either Dubilier or Rice or both attended that meeting. Later that month, Drexel presented to Dubilier and Rice exclusively a document entitled "Uniroyal Plastics Company Preliminary Valuation Analysis." *Id.* at ¶ 42. The alleged purpose of the document was to provide a basis for determining the market value of Plastics.

On February 5, 1986, Drexel circulated a new draft offering memorandum to Rice and Dubilier, among others. *Id.* at ¶ 43. The cover letter accompanying the draft noted in detail the areas of Plastics' business requiring attention by the recipients of the draft. For example, the letter directed the recipients' attention to "more detail on competition in coated fabrics and roofing adhesives." *Id.* It also contained notice that the recipients of the draft would meet the following week to discuss the draft and the noted areas of Plastics' operations.

On February 13 at approximately 9 a.m., Dubilier spoke with defendants Castaldi, Alvine and Nevins by phone about the financial statements to be included in the offering memorandum. *Id.* at ¶ 44. Polycast alleges that during this conversation, Dubilier specifically discussed how the offering memorandum should present Plastics' management personnel, legal, treasury, computer, communications and industrial relations expenses. The following day, February 14, Drexel circulated a revised draft offering memorandum to Rice and Dubilier among others. *Id.* at 45. A note accompanying this draft stated that it incorporated "comments received from ... Clayton and Dubilier during the past week." *Id.* Subsequently, Drexel circulated the final draft of the Plastics offering memorandum to Rice and Dubilier, among others.

On about February 24, Dubilier contacted Castaldi who later reported his discussions with Dubilier to Nevins. *Id.* at ¶ 47. Polycast alleges—on information and belief based on Nevins' notes—that Castaldi "instigated by" Dubilier, pressured Nevins to "find purported support" for the inflated 1986 earnings forecasts for Plastics to disclose to Polycast. *Id.* More specifically, Castaldi allegedly pressured Nevins "as to why Uniroyal could not project higher 1986 earnings for Plastics based upon alleged Plastics capital spending programs." Polycast alleges, again on information and belief, that Dubilier and Castaldi knew that, in fact, these alleged capital and spending programs—to the extent they existed at all—were "catch-up" efforts to remedy past business failures that could not make up the shortfall in Plastics' earnings.

Dubilier then telephoned Uniroyal employees to discuss the draft offering memorandum. Based on the notes from the files of defendant John Graham, Polycast alleges on information and belief that during that telephone call Dubilier discussed the earnings forecasts for Plastics to be included in the offering memorandum. *Id.* at ¶ 48. Finally, on March 26, Drexel submitted to Dubillier, among others, a draft letter describing the procedure for submitting indications of interest in purchasing Plastics, the final version of which was to be sent to prospective purchasers.

In March 1986, Uniroyal delivered the offering memorandum to Polycast and others. The memorandum described Plastics' business and painted an optimistic picture of its future prospects. It contained financial data and estimated income for 1986 and beyond, including a specific projection that Plastics would earn approximately $24 million during 1986. *Id.* at ¶ 53. Polycast contends that in reliance on the representations in the offering memorandum, it bid for Plastics' shares. *Id.* at ¶¶ 53–55.

On April 14, Drexel sent defendants Dubilier, Rice and Joseph Flannery, Chairman, Chief Executive Officer and President of Uniroyal, a preliminary summary of the indication of interest letters received from bidders describing their identities and bid amounts. This summary was not sent to anyone else. Shortly thereafter, Drexel met with Flannery and Dubilier or Rice or both to obtain a decision from C & D and Uniroyal as to which bidders would be allowed to proceed in the bidding process. *Id.* at ¶ 57.

As outlined in the Court's prior opinion, on May 8, Uniroyal managers met with Polycast and lowered Plastics' forecasted 1986 earnings from $24 million to $22.5 million. *Id.* ¶¶ 53–55. On June 5, Oliver Kirrane, Controller of Plastics calculated an optimistic 1986 earnings forecast of $18.3 million which, when adjusted for expenses, would be no more than $17.7 million. About June 12, Uniroyal again lowered Plastics' earnings forecast, this time to $20.5 million. Polycast alleges that defendants knew that forecast to be false. *Id.* at ¶ 64.

Around June 24, Uniroyal responded to inquiries from Polycast by lowering Plastics 1986 earnings forecast to $17.6 million. Polycast contends that in reality, Plastics' financial condition continued to deteriorate, and consequently, this forecast was also false.

On June 30, Kirrane wrote Castaldi that a forecast of Plastics' 1986 earnings of even $16 million "would be a stretch," and in fact was "not realistic." *Id.* at ¶ 69. Kirrane felt that the maximum stretch forecast for Plastics' 1986 earnings, even incorporating unrealistic market assumptions, was $13.1 million.

About July 23, Polycast submitted the winning bid for Plastics of $134 million and Uniroyal, Plastics and Polycast entered into an agreement for Polycast to buy all of Plastics' outstanding shares. In the months thereafter, defendant Alvine, Vice President of the Engineered Plastics Group and Langhorne Reid III, then a managing director of Drexel, allegedly told Howard Curd, Chairman of Polycast, that Rice was the person principally responsible for determining the sale price of Polycast. *Id.* at ¶ 77. On August 27, defendants lowered their estimate of Plastics' 1986 earnings to $15.5 million. Based on this material change in financial condition of Plastics,

Polycast withdrew its offer and terminated the purchase agreement.

Plaintiff alleges that in September, Uniroyal and C & D mounted a campaign to induce Polycast to return to the negotiating table. At a meeting held at C & D's office on September 5, defendants Castaldi and Alvine, in the presence of Rice and allegedly acting on behalf of all defendants, including the C & D defendants, "represented to Polycast that (a) October 1986 would be a boom for Plastics; (b) September 1986 would be a very profitable month; (c) prior reductions in earnings were one time hits and nonrecurring in nature; and (d) the adhesives division was going to take off." *Id.* at ¶ 80. Castaldi and Alvine, acting on behalf of all defendants, also told Polycast that Uniroyal's final projection of Plastics' 1986 earnings was $13.3 million and that number was a rock bottom estimate which could be "taken to the bank." Polycast alleges on information and belief that in fact all defendants knew that the $13.3 million forecast was false.

About September 10, Polycast Chairman Curd spoke with Rice by telephone and told him that because Polycast had calculated its bids as multiples of Plastics' projected 1986 earnings, the accuracy of the latest forecast was of great importance. *Id.* at 84.

On or before September 12, Castaldi and Alvine prepared an updated description of Plastics for transmission to Polycast and sent it to Dubilier and Rice for review. Polycast alleges that this document untruthfully asserted that "the Plastics Company has reacted to the adversities of the first part of 1986 and is now positioned to move forward with increased profitability." Three days later, Alvine told a group of Uniroyal employees that Plastics' actual 1986 earnings would be materially lower than the $13.3 million figure disclosed to Polycast.

On September 23, 1986, Polycast, Uniroyal and Plastics entered into a letter agreement modifying certain terms of the Purchase Agreement, but confirming the $13.3 million projection. On October 31, 1986, the deal closed at a price of $110 million. Plastics in fact earned $5.25 million in 1986.

On May 13, 1987, Polycast filed the instant action alleging securities and common law fraud.

## B. DISCUSSION

Fed.R.Civ.P. 9(b) provides that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind may be averred generally."

■■■■ In order to state a claim under § 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder, plaintiffs must plead each defendant's scienter. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976). Although scienter may be averred generally, plaintiffs must nonetheless provide some minimal factual basis for conclusory allegations of scienter that give rise to a strong inference that the defendants possessed the requisite fraudulent intent. *Connecticut Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir.1987). "A common method for establishing a strong inference of scienter is to allege facts showing a motive for committing fraud and a clear opportunity to do so." *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), *overruled on other grounds*, *United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989) (en banc); *see also Goldman v. Belden*, 754 F.2d 1059, 1070 (2d Cir.1985) (complaint specifically alleged facts which supported the allegation of defendants' knowledge). On a motion to dismiss claims under 9(b), the Court must construe the allegations of the complaint "with great generosity" in favor of the pleader. *Yoder v. Orthomolecular Nutrition Inst.*, 751 F.2d 555, 558, 562 (2d Cir.1985). The Court will apply these standards to each of Polycast's allegations of fraud in turn.

1. Violations of § 10(b) of the Exchange Act as principals

 A. *Rice and Dubilier*

■■■ Reading the complaint liberally, the Court finds that Polycast has corrected the

deficiencies in its complaint previously addressed by this Court. *Polycast Technology v. Uniroyal, Inc.*, 87 Civ. 3297 (S.D.N.Y. 1988) slip op. at 11. Plaintiff has pled sufficient facts to link Rice and Dubilier to the alleged frauds and to give rise to a strong inference that they possessed knowledge of the alleged frauds. The complaint states that Rice and Dubilier received the "Uniroyal Plastics Company Preliminary Valuation Analysis" which provided a basis for determining the market value of Plastics. After receiving this document, Rice and Dubilier allegedly helped draft the fraudulent offering memorandum. In fact, their comments were incorporated into the February 14, 1986 draft. Dubilier allegedly discussed the financial statements to be included in the offering memorandum with defendants Castaldi, Alvine and Nevins, whose fraudulent intent is unchallenged on this motion. Plaintiff also alleges, on the basis of defendant Graham's notes, that Dubilier discussed the earnings forecasts that were included in the memorandum.

Further, representatives of both Uniroyal and Drexel allegedly told Polycast Chairman Curd that Rice was principally responsible for determining the sale price of Plastics. Rice and Dubilier attended meetings that involved a thorough examination of Plastics' business by Uniroyal and Plastics officials, and a meeting at which, Polycast alleges, a known shortfall in the earnings forecast was discussed. Plaintiffs need not prove scienter at this stage of the litigation. They need only allege facts from which the fact finder could infer scienter. Read together, the allegations of the complaint raise such an inference.[1]

Polycast's allegations of Rice and Dubilier's beneficial interest in Uniroyal's assets implicitly establish a motive for committing fraud. The allegations of their involvement in the preparation of the offering memorandum demonstrate an opportunity for doing so and support the inference of knowledge on their part. Therefore, defendants' motion to dismiss the § 10(b) and common law fraud claims against Rice and Dubilier as principals is denied.

### B. *C & D Private Equity and C & D Associates*

While this Court rejects the notion of "inference by status alone", *Id.* at 12, the intertwined management and financial structures of Uniroyal, C & D Private Equity and C & D Associates, when viewed in light of the allegations of Rice and Dubilier's involvement in the preparation of the offering memorandum, also permits an inference of knowledge on the part of these defendants. *See In re Coleco Securities Litigation*, 591 F.Supp 1488, 1490 (S.D.N.Y.1984) (sufficient factual basis for scienter exists where the complaint alleged that defendants had knowledge of false statements due to their management positions).

Partnership liability is rooted in agency principles; it requires no actual participation in or knowledge of the acts performed by the partners to impose liability. *Northwestern Nat. Bank of Minneapolis v. Fox & Co.*, 102 F.R.D. 507 (S.D.N.Y.1984). Rice and Dubilier were general partners of C & D Associates Limited Part-

---

1. In considering the C & D defendants' 9(b) motion the Court reviewed the Third Amended Complaint, the exhibit thereto and memoranda of law submitted in support of and in opposition to the motion. The Court did not consider the exhibits attached to the affidavit of defendants' counsel which defendants claim show that the complaint draws unwarranted inferences. The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985) (District court could not consider documents outside the complaint to determine whether defendant's alleged statement could fairly be viewed as deceptive. Motion to dismiss could not be used to test whether the complaints' interpretations of defendant's statements were fair.) On a motion to dismiss, the court must limit itself to a consideration of the facts alleged on the face of the complaint and any documents attached as exhibits or incorporated by reference. *Goldman*, 754 F.2d 1059, 1065–67 (2d Cir.1984). The exhibits submitted by defendants were not attached to the complaint nor were they incorporated by reference. Although some of the documents were quoted in the complaint, limited quotation does not constitute incorporation by reference. *Cosmas v. Hassett*, 886 F.2d 8 (2d Cir.1989).

nership, which in turn is a general partner of C & D Private Equity Limited Partnership. Private Equity owned 32.5% of the common stock of CDU Holding. CDU in turn owned all of the common stock of Uniroyal from September 24, 1985 to December 2, 1986. Thus, Private Equity, C & D Associates, and Rice and Dubilier were all beneficially interested in the sale of Plastics. Rice and Dubilier's actions to further their own interests simultaneously furthered the interests of the partnerships, and thus their actions were within the scope of their authority.

While it is true that "basic principles of corporate law presume that absent a rather egregious disregard of corporate formalities, one corporate entity or an individual with a substantial interest in the corporation is not automatically or readily responsible for the acts of another entity," *The Limited v. McCrory Corp.*, 645 F.Supp. 1038, 1044 (S.D.N.Y.1986), upon review of the parties' submissions, the Court finds that this principle is not at issue here. It is not the doctrine of corporate veil piercing that renders Private Equity and C & D Associates potentially liable for frauds of their principals, but rather ordinary principles of agency and partnership law. Accordingly, defendants' motion to dismiss Polycast's § 10(b) and common law fraud claims against Private Equity and C & D Associates is denied.

### C. *C & D, Inc.*

▉ Polycast has also sufficiently connected C & D to the alleged frauds. Rice and Dubilier were officers and employees of C & D and may be said to have acted on behalf of the company in the preparation of the offering memorandum. Rice and Dubilier's involvement took place in 1985 and 1986, during which time Uniroyal was paying C & D $1,000,000 per year for financial and management consulting services. Furthermore, another employee of C & D, Peter Dolle attended at least one meeting where the earnings forecast was discussed. As with Private Equity and C & D Associates, there is no need to pierce the corporate veil for C & D to be liable for the acts of its employees. Accordingly, defendants'

motion to dismiss Polycast's § 10(b) and common law fraud claims against C & D as a principal is denied.

### 2. *Violations of § 10(b) as Aiders and Abettors*

▉ In the first count of the Third Amended Complaint, Polycast alleges that the C & D defendants were not only principal violators of § 10(b) of the Exchange Act, but also aided and abetted these violations. The C & D defendants have moved to dismiss this charge for failure to plead fraud with particularity as well. As set forth in the Court's prior opinion, the

> general requirements for establishing aiding and abetting liability are well settled in this Circuit. Plaintiff must prove (1) a securities law violation by the primary wrongdoer, (2) knowledge of the violation by the person sought to be charged, and (3) proof that the person sought to be charged substantially assisted in the primary wrongdoing. [citation omitted].

*Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983); *Bresson v. Thomson McKinnon Securities, Inc.*, 641 F.Supp. 338, 348 (S.D. N.Y.1986).

Polycast's allegations supporting the claims against the C & D defendants as principal violators of § 10(b) of the Exchange Act also satisfy the standard for aider and abettor liability. Plaintiff has adequately pleaded the C & D defendants' scienter, and has sufficiently alleged the substantial assistance the C & D defendants rendered the other defendants in the alleged fraud. Accordingly, defendants' motion to dismiss the aiding and abetting charges against them is denied.

### 3. Violations of § 12(2) of the Securities Act

▉ The C & D defendants have moved to dismiss counts two and three of the Third Amended Complaint, charging the C & D defendants with violations of § 12(2) of the Securities Act, for failure to state a claim upon which relief can be granted. Defendants argue that Polycast has not adequately pleaded that they solicited a

sale of securities for financial gain within the meaning of § 12(2). For the reasons stated below, this motion is denied.

Section 12(2) of the Securities Act creates a right of action for a purchaser who claims the security he or she bought was offered or sold by means of a prospectus or oral communication which includes an untrue statement of a material fact or omits to state a material fact. 15 U.S.C. § 77*l* (2). The Second Circuit, applying the Supreme Court's analysis of section 12(1) liability as articulated in *Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), has recently held that scienter is not required to state a claim under § 12(2) of the Securities Act against a defendant who solicited the sale of securities for financial gain. *See Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124 (2d Cir. 1989), citing *Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). The court in *Wilson* stated that:

> Persons who are not in privity with the plaintiff but who would have been collateral participants under our former case-law will now be statutory sellers within the meaning of *Pinter* if they solicited the sales in question for financial gain ... whether or not scienter is shown.

*Id.* at 1126. This Court's inquiry, consequently, must focus on whether the C & D defendants' participation in the sale of Plastics amounted to solicitation of the sale.

In discussing the scope of the word "seller" for the purposes of § 12 liability, the Supreme Court stated that since "solicitation is the stage at which an investor is most likely to be injured," *Pinter*, 108 S.Ct. at 2078, the term "seller" must include persons who solicit the purchase for financial gain. Solicitors are statutory sellers because they are "well positioned to control the flow of information to a potential purchaser, and, in fact, such persons are the participants in the selling transaction who most often disseminate material information to investors." *Id.* 108 S.Ct. at 2078.

As the Second Circuit has interpreted the term "solicitation," no direct contact between the purchaser and the purported "solicitor" is necessary for § 12(2) liability. In *Capri v. Murphy*, 856 F.2d 473 (2d Cir. 1988), the court found solicitation within the meaning of § 12(2) where the defendants, although they were never in direct communication with the plaintiff investors, provided the information that was supplied to the purchasers by their colleague and contemplated and authorized all actions taken in relation to the investors. *Id.* at 478. The court found that the colleague's promotional efforts could be directly attributed to the defendants under these circumstances.

Here, the defendants' alleged direct contacts with Polycast are limited to a phone call by Rice to Curd, Polycast's Chairman, in which Curd emphasized the importance of Plastics' 1986 earnings forecast in Polycast's decision to bid, and Rice's attendance at a meeting allegedly designed to induce Polycast to buy Plastics' after it had terminated the original purchase agreement. However, like the defendants in *Capri*, Rice and Dubilier supplied the information that was transmitted to Polycast through their significant participation in and oversight of the drafting of the placement memorandum. Furthermore, Rice and Dubilier allegedly were principally responsible for determining which potential bidders would be offered the opportunity to review the memo and bid, and ultimately decided which bidders would be allowed to proceed in the bidding process, assisted only by Mr. Flannery, President and Chairman of Uniroyal. Although their direct contacts with Polycast were limited, by determining who would bid for Plastics and what information those bidders would receive, Rice and Dubilier effectively authorized and contemplated the communications of the other defendants with Polycast.

Under these circumstances, the Court concludes that Polycast has adequately alleged that Rice and Dubilier are "sellers" within the meaning of § 12(2) of the Securities Act as are the C & D entities according to the agency principles discussed above. Accordingly, defendants' motion to dismiss counts two and three of the Third Amended Complaint is denied.

## II. *Plaintiff's Motion for Leave to File Amended Complaint*

Polycast has moved pursuant to Fed.R. Civ.P. 15(a) to amend the Third Amended Complaint to (1) add Uniroyal Plastics Acquisition Corporation ("UPAC") as plaintiff; (2) delete Polycast's prior allegations that defendant Donald L. Nevins, Jr. was a "controlling person" of Uniroyal; (3) divide its breach of warranty claim into two claims, one for breach of warranty and one for indemnity; (4) change the word "projection" to the word "forecast" throughout the complaint; (5) plead explicitly that it was defrauded by defendants' 1987–1990 earnings forecasts for Plastics; (6) add a claim for reformation of the Purchase Agreement; (7) add a claim against all defendants under The Racketeer Influenced and Corrupt Organizations Act ("RICO"); to add claims in connection with its proposed RICO claim that (8) defendants defrauded Polycast by failing to disclose that prior to the closing of the Plastics sale, Northrop Corporation had cancelled its contract to purchase fuel cells from Plastics; (9) defendants violated the securities laws by wrongfully inducing Polycast to issue debt securities in order to finance its purchase of Plastics; (10) defendants committed numerous acts of mail and wire fraud. The Court will address each of the proposed amendments in turn.

### A. DISCUSSION

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend a pleading "shall be freely given when justice so requires." The Supreme Court has instructed that:

> [i]f the underlying facts or circumstances relied upon by the party may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory notice on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.

—leave should, as the rules require, be "freely given".

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). "Mere delay alone, absent a showing of bad faith or undue prejudice does not provide a basis for a district court to deny the right to amend." *State Teachers Retirement Board v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir.1981) (district court's denial of leave to amend reversed despite fact that amendments were brought three years after plaintiffs learned of facts supporting amendment and one year after plaintiffs completed relevant depositions); *S.S. Silberblatt v. East Harlem Pilot Block–Building 1 Housing Development Fund Co.,* 608 F.2d 28 (2d Cir.1979) (no prejudice sufficient to deny leave to amend even though new claim was asserted after discovery had proceeded for two years). Rule 15(a), however, gives the court authority to impose conditions when leave to amend is allowed. *See* 6 Wright & Miller, Federal Practice and Procedure (1971), § 1486 at 423–24. The most common condition imposed on an amending party is costs. *Id.* at 424; *see also Pollux Marine Agencies v. Louis Dreyfus Corp.,* 455 F.Supp. 211, 216 (S.D.N.Y.1978).

#### 1. The Addition of UPAC as a Plaintiff

Defendants do not object to Polycast's adding UPAC as a plaintiff at this time. UPAC was formed for the purpose of acquiring Plastics and, with defendants' prior knowledge and permission, was assigned all of Polycasts' rights under the Purchase Agreement. UPAC continues to hold all of Plastics' stock and is a proper party to this action. Polycast's motion for leave to add UPAC as a plaintiff is therefore granted.

#### 2. Deletion of "Controlling Person" Allegations

Defendants do not object to Polycast's deletion of its prior allegation that defendant Nevins was a "controlling person" of Uniroyal and its parent, CDU Holding, Inc. for purposes of the federal securities laws. Polycast's motion to delete this allegation is granted.

### 3. Division of Breach of Warranty Claim

Nor do defendants object to dividing the breach of warranty claim in the Third Amended Complaint into two claims, one for breach of warranty and one for indemnity. Polycast's motion to do so is, therefore, granted.

### 4. Request to Change "Projection" to "Forecast"

Plaintiffs' unexplained request to change the word "projection" to "forecast" throughout the complaint is granted. While the rationale behind this change remains obscure, the strong policy of the Federal Rules permitting amendment of pleadings especially where, as here, the non-movant has not asserted any resulting prejudice, favors the plaintiff's request.

### 5. Reformation Claim

Plaintiff has also moved to add a claim for reformation of the Purchase Agreement to allow Polycast to recover under the agreement's indemnity provisions. Defendants oppose the motion. Their contention is that the Agreement on its face precludes any argument that Polycast is an indemnitee and that its clear language forecloses the inquiry into the parties' intent to include Polycast as an indemnitee without which there can be no reformation. In addition, defendants argue undue delay and that they will be prejudiced by the addition of such a claim because it will require them to re-depose two witnesses who allegedly omitted Polycast as a protected party under the indemnification provisions of the agreement.

▪ Upon review of the relevant portions of the Purchase Agreement quoted in the proposed complaint, the court concludes that the language of the agreement does not preclude an inquiry into the parties' intent. Plaintiffs allege that Section 8.2(a) of the Purchase Agreement provides in part that "Seller agrees to indemnify and hold harmless the Buyer Indemnities" against, *inter alia*, certain expenses "resulting from or arising out of the breach of any representation ... of the Seller or the Company contained in the Agreement." Plaintiffs further allege that the Purchase Agreement defines the "Buyer" as Polycast. Section 1.1 of the agreement defines "Buyer Indemnitees" as "Buyer's officers, directors, controlling persons, employees, attorneys, agents, subsidiaries, affiliates and stockholders, in each case past and present, or as they may exist at any time after the date of the Agreement."

Polycast contends that in drafting and revising the agreement, it did not intend to exclude Polycast from the indemnitee provision's coverage, but rather intended to enlarge the class of persons entitled to indemnification. To the extent that the definition of "Buyer Indemnitees" is construed to exclude Polycast, plaintiffs maintain that the Purchase Agreement reflects a mutual mistake by the parties, and fails to reflect the parties' true intent. Polycast cites, among other things, section 8.2(d), entitled "Conditions Precedent to *Buyer's* Right to Indemnification" as evidence of the parties' true intent (emphasis added). That section provides that the "*Buyer* shall be entitled to indemnification" for certain expenses (emphasis added). Plaintiffs cite other provisions of the agreement which also tend to support their contentions. Polycast also notes that earlier drafts of the agreement clearly included the buyer—Polycast—as an indemnitee, and that Uniroyal at no time during negotiations asked Polycast to sacrifice indemnification protection for itself. Since, Polycast argues, it would not have surrendered this protection unilaterally, to the extent the agreement can be interpreted to preclude such coverage, it reflects a mistake in the final version of the agreement. Under these circumstances, the Court concludes that the language of the agreement does not on its face preclude an inquiry into the intent of the parties.

▪ Polycast is not guilty of undue delay in seeking this amendment as it appears that the parties' differing views of the coverage of the Purchase Agreement was brought to light only by defendants' response to the Third Amended Complaint. Furthermore, defendants are not unduly

prejudiced by the limited re-discovery they allege will be necessary. Defendants do not allege that plaintiffs proffer this amendment in bad faith. Accordingly, plaintiffs' request for leave to add a claim for reformation is granted.

### 6. RICO Claim against all Defendants

Plaintiffs' proposed amended complaint charges all defendants with violations of 18 U.S.C. § 1962. To state a claim under RICO, a complainant must allege:

> (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate commerce.

*Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). Defendants contend that leave to amend should be denied because plaintiffs have failed to plead many of the proposed predicate acts of racketeering activity adequately, and because the alleged conduct did not involve sufficient continuity or threat of continuity to constitute a "pattern" within the meaning of the statute. The Court will first examine Polycast's proposed list of predicate acts, and will then examine whether these acts sufficiently establish a "pattern" under RICO.

### A. *Proposed Predicate Acts*

#### 1. Earnings Projections

Polycast seeks to satisfy the requirement of pleading the predicate acts of "racketeering activity," in part, by alleging that each of the five allegedly false earnings forecasts defendants gave plaintiffs constitutes a separate act of securities fraud and thus a separate predicate act for the purposes of RICO.

Defendants argue that the allegations of fraud in connection with their issuance of revised false earnings projections are deficient because these "superseded" projections did not proximately cause injury to plaintiffs. Defendants claim that in purchasing Plastics, Polycast did not rely on these interim projections, but relied solely upon Uniroyal's final forecast of $13.3 million.

In order to assert a cause of action under Rule 10b–5, a private plaintiff must prove that he relied to his detriment upon the defendant's deception. *See S.E.C. v. Tome*, 638 F.Supp. 596, 620 n. 46 (S.D.N.Y.1986). The private plaintiff must prove two types of causation: loss causation—that the misrepresentations caused the economic harm—and transaction causation—that the plaintiff relied on the misrepresentations and was thereby induced to engage in the transaction. *Schlick v. Penn–Dixie Cement Corporation*, 507 F.2d 374, 380 (2d Cir.1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). Furthermore, in order to bring a private cause of action for damages, a plaintiff must show that the allegedly fraudulent activity involved an actual purchase or sale of securities. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731, 95 S.Ct. 1917, 1923, 44 L.Ed.2d 539 (1975) (section 10(b) reveals no congressional intention to extend a private civil remedy for damages to other than defrauded purchasers or sellers of securities in light of Congress' refusal to change section 10(b)'s wording from "in connection with the purchase or sale of any security" to "in connection with the purchase or sale of *or any attempt* to purchase or sell, any security.").

Polycast's allegations of fraud in the revised earnings forecasts do not satisfy these requirements and are deficient as separate section 10(b) claims. Polycast states in its complaint that it relied on the final $13.3 million forecast in entering its final, successful bid for Plastics. Proposed Amended Complaint at ¶ 122. Plaintiffs cannot maintain that they ultimately relied on both the earlier, higher estimates and the final, reduced forecast simultaneously. While plaintiffs may have relied on the earlier forecasts in deciding to pursue the bidding process with Uniroyal, this reliance is not actionable under section 10(b) which gives private plaintiffs a right of action only if that reliance culminates in an actual

sale or purchase of securities. Although Polycast did ultimately purchase securities, they purchased in reliance on the $13.3 million forecast, not the earlier projections. Where a claim of fraud under section 10(b) is deficient for failure to adequately allege causation, it cannot serve as a predicate act for a civil RICO claim. *Nevitsky v. Manufacturers Hanover Brokerage Service*, 654 F.Supp. 116, 118–120 (S.D.N.Y.1987).

■ Plaintiffs maintain that since the defendants' misrepresentations are violations of the securities laws that the Securities and Exchange Commission ("SEC") could prosecute, they are properly pled racketeering activities for purposes of RICO despite the fact that they are not sufficient to support a private right of action. In an SEC enforcement action, there is no requirement of reliance or damages in order to state a claim under section 10(b) and Rule 10b–5 promulgated thereunder. The SEC need only allege (1) a misrepresentation or other fraudulent device; (2) in connection with the purchase or sale of any security; (3) scienter by the defendant in making that misrepresentation; and (4) materiality. *See S.E.C. v. Tome*, 638 F.Supp. 596 (S.D.N.Y.1986). Thus, plaintiffs maintain, the defendants' frauds are "racketeering" activities defined as "any offense involving … fraud in the sale of securities." 18 U.S.C. § 1961(1)(D).

■ The Court concludes that it need not reach this issue. In order to state a claim under RICO, plaintiffs must allege the requisite causal nexus between the alleged injury and the defendant's alleged predicate acts. *See In re Gas Reclamation, Inc. Securities Litigation*, 663 F.Supp. 1123 (S.D.N.Y.1987); *see also Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496–97, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (a RICO plaintiff "only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation"); *Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb*, 709 F.Supp. 438 (S.D.N.Y.1989). Plaintiffs have not sufficiently alleged how these amended forecasts proximately caused the

loss, given the fact that Polycast states in its complaint that it purchased Plastics in reliance on the final projection. Therefore, defendants' fraud in the earlier forecasts cannot be predicate acts for the purposes of plaintiffs' RICO claim.

### 2. Fraud in the 1987–90 Earnings Projections

■ Plaintiff has moved to amend its complaint to add as a predicate act for purposes of RICO, a charge that defendants violated § 10(b) of the Exchange Act and § 12(2) of the Securities Act by communicating to Polycast false 1987–90 earnings forecasts for Plastics. Proposed Fourth Amended Complaint at ¶ 72–74, 170. In deciding a motion for leave to amend, the Court must determine whether the proposed amendments state a cognizable claim. *See* 3 J. Moore, *Moore's Federal Practice* ¶ 15.08[4] at 15–80 (1988); *Kirkland v. City of Peekskill*, 634 F.Supp. 950, 951 (S.D.N.Y.1986). "Amendment should be refused only if it appears to a certainty that plaintiff cannot state a claim." *Square D. Co. v. Niagara Frontier Tariff Bureau, Inc.*, 760 F.2d 1347, 1366 (2d Cir. 1985). Thus, in considering Polycast's motion, the court must consider the sufficiency of these additional fraud claims under Fed.R.Civ.P. 9(b).

■ The Court need not repeat the requirements of Rule 9(b) which are set forth at length above. Upon examination of the Proposed Amended Complaint, and drawing all inferences in favor of plaintiff, the Court finds that Polycast has met the requirements of the rule with respect to allegations of fraud in the 1987–90 forecasts set forth in paragraphs 72–74 of the proposed complaint. The allegations specify the time, place, speaker and content of the alleged misrepresentations as required by the rule. *DiVittorio v. Equidyne Extractive Industries*, 822 F.2d 1242, 1247 (2d Cir.1987). The proposed amendment also adequately alleges scienter with respect to the 1987–1990 forecasts. Plaintiffs have sufficiently pled scienter on the part of the defendants in misrepresenting Plastics' 1986 earnings. The allegations

state that the 1987–1990 forecasts were "based in part" on the allegedly false 1986 forecasts. In addition, all defendants were involved in the preparation of the allegedly fraudulent offering memorandum which also contained the false forecasts for 1987–1990. Defendants' extensive involvement in the sale of Plastics and the importance of the future earnings projections in that process give rise to an inference of knowledge on the part of the defendants. *See Cosmas, supra* 886 F.2d at 13. Since the allegations of fraud in the 1987–90 forecasts arise from the same facts alleged in the original complaint, they relate back to the original complaint within the meaning of Fed.R.Civ.Pro. 15(c). Therefore, the proposed amendments are timely brought and would not be futile.

■ Although the proposed amendment is legally sufficient, this finding does not end the Court's inquiry. The Court must also consider undue delay, bad faith, and perhaps most important, the resulting prejudice to the opposing party if leave to amend is granted. *See Foman v. Davis,* 371 U.S. at 182, 83 S.Ct. at 230.

Polycast offers no excuse for its almost two year delay in bringing the proposed amendment. It is undisputed that Polycast was in possession of the facts supporting its proposed amendment when it filed its original complaint in this action in May, 1987. Since that time it has amended its complaint on three occasions without adding the proposed claim. However, "mere delay in presenting an amendment absent a showing of bad faith or undue prejudice, does not provide a basis for the district court to deny the right to amend." *See State Teachers Retirement Board v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir. 1981); *Zeigan v. Blue Cross and Blue Shield of Greater New York,* 607 F.Supp. 1434, 1438 (S.D.N.Y.1985).

■ Defendants argue that Polycast has proffered its amendment in bad faith as a tactical maneuver to bolster its claims which are now vulnerable to summary judgment. The Court disagrees. Defendants have failed to show that plaintiffs are acting in bad faith. "Many amendments will be afterthoughts; often they will be engendered because counsel anticipate defeat on the initial complaint. Such realities alone do not support denial of a motion to amend." *Middle Atlantic Utilities Co. v. S.M.W. Dev't Corp.,* 392 F.2d 380, 385 (2d Cir.1968). Furthermore, as discovery has not yet been completed, it would be inappropriate for the court to assess plaintiffs chances of surviving summary judgment at this time.[2]

■ Defendants argue that they will be unduly prejudiced by new allegations of fraud at this point in the litigation since much discovery of evidence relevant to the new charges has already taken place. Although defendants admit that they have taken certain discovery on the 1987–90 forecasts, they argue that in order to defend separate fraud claims based on the 1987–90 forecasts, they will have to re-review thousands of documents and re-examine ten Plastics' employees and four Drexel employees who have already been deposed. Defendants claim the financial burden of such re-discovery would unduly prejudice them. Plaintiffs maintain that extensive re-discovery will not be necessary as the fraud claims raised in their amendments are already in the case, and the discovery that has taken place thus far has focused on those forecasts.

Document discovery has not yet been completed and expert discovery has not yet begun in this case. Discovery has focused to some extent on the 1987–90 forecasts.

---

**2.** In addition, both parties have asked the Court to evaluate documentary evidence in determining whether plaintiff's claims are vulnerable to summary judgment. The court declines to review these submissions. The court's inquiry on a motion to amend a complaint to add new legal claims is comparable to that required by Fed.R. Civ.P. 12(b)(6) as to whether the proposed amendments state a cognizable claim. A Rule 12(b)(6) motion is to be decided solely on the pleadings construed favorably to the pleader. It would therefore be improper for the Court to consider facts beyond the scope of the pleading. Accordingly, it would be inappropriate for the Court to consider such an evidentiary proffer on a motion for leave to amend. *See CBS, Inc. v. Ahern,* 108 F.R.D. 14, 18–19 (S.D.N.Y.1985).

Defendants have requested documents about the later forecasts and have questioned numerous witnesses about them. *See* Polycast's Reply Mem. at 15. Furthermore, the 1987–90 forecasts appear to have been developed through the same process that produced the 1986 forecast. In view of these facts and the policy favoring amendment of pleadings to facilitate resolution of disputes on the merits rather than on pleading technicalities, *see Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), the Court grants plaintiff's motion to add the additional fraud claims. However, in order to cure any prejudice to the defendant due to the addition of these claims, the Court orders plaintiffs to pay the costs of any duplicative discovery necessitated by such amendments.

### 3. The Northrop Contract

■ Plaintiffs have moved for leave to add as a predicate act allegations that defendants defrauded them by failing to disclose that in September 1986, the Northrop Corporation cancelled its multi-million dollar contract to buy fuel cells from Plastics. Polycast alleges that the placement memorandum "boasted" about the contract, and in a June 6, 1986 presentation, representatives of Plastics and Uniroyal told Polycast of the expected sales to Northrop. On September 16, defendant Alfred Weber, Vice President and General Manager of Plastics, allegedly received a memorandum indicating that Northrop had cancelled the contract. Weber also allegedly sent a telex to Northrop on September 3, stating that the cancellation of the Agreement would have a material impact on Plastics. Defendants argue that these allegations do not adequately plead scienter with respect to any defendants other than Alvine and Weber. The Court disagrees.

■ Plaintiffs' proposed complaint alleges facts from which one can reasonably infer that the Northrop contract was an important source of income to Plastics, expected to result in $5.7 and $5.3 million in sales in 1986 and 1989 respectively.[3] Defendants touted the contract to Polycast both in the offering memorandum, the preparation of which all defendants participated in, and at a meeting on June 6, 1986. Weber admitted that the cancellation of the contract would "have a material impact on [Plastics]." Proposed Amended Complaint at ¶ 109. The loss of the contract apparently eliminated a significant source of income for Plastics. These facts give rise to a strong inference that all of the defendants, who the proposed amended complaint alleges were intimately involved and financially interested in the sale of Plastics, had knowledge of the cancellation of the contract. *See Cosmas v. Hassett, et al.,* 886 F.2d 8, 13 (2d Cir.1989) (inference of scienter raised by fact that defendants were directors of company and the information at issue affected an important source of company income). Accordingly, plaintiffs' motion to add this alleged securities law violation as a predicate act is granted.

### 4. Polycast's Issuance of Debt Securities

Polycast also wishes to amend its complaint to add as a predicate act a claim that defendants violated the securities laws by wrongfully inducing Polycast and UPAC to issue, place and sell debt securities to finance its purchase of Plastics. Defendants maintain that Polycast's issuance of debt securities in reliance on defendants' alleged misrepresentations is not a separately chargeable violation of Rule 10b–5, distinct from plaintiffs' charge that defendants violated the securities laws by inducing Polycast to purchase Plastics' shares. Defendants further maintain that plaintiffs' sale of debt securities is not a separate predicate act for the purposes of RICO.

---

**3.** Polycast also points to discovery documents and deposition testimony to raise an inference of knowledge. The Court declines to consider these proffers as it is well established that on a motion to dismiss, the court must limit itself to a consideration of the facts alleged on the face of the complaint, and to any documents attached as exhibits or incorporated by reference. *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir. 1984).

■ The Court concludes that plaintiffs have alleged a separate violation of section 10(b) and Rule 10b–5 in connection with their placement of debt to finance the purchase of Plastics. Section 10(b) and Rule 10b–5 provide damages for misrepresentations made "in connection with the purchase or sale of securities." *See Royal American Managers v. I.R.C. Holding Corp.*, 885 F.2d 1011, 1015 (2d Cir.1989). The securities plaintiffs sold were distinct from the shares of Plastics that the plaintiffs acquired. Plaintiffs allege that they sold debt securities in reliance on defendants' misrepresentations about Plastics' financial prospects. The fact that the sale was the plaintiffs' act, rather than the defendants' is not a bar to plaintiffs' claim as the alleged fraud occurred "in connection with" a sale of securities. *See Superintendent of Insurance v. Bankers Life and Casualty*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971).

■ Defendants argue that despite the fact that their conduct may have resulted in two separate violations of the securities laws, their single act of misrepresenting Plastics' projected earnings cannot be regarded as two predicate acts under RICO. Upon examination of the parties' submissions, the Court agrees.

The parties have not identified, nor has the Court been able to find, Second Circuit authority directly addressing this issue. The Court, however, finds the reasoning of the Eighth and Ninth Circuits persuasive on this point. In *U.S. v. Walgren*, 885 F.2d 1417 (9th Cir.1989), the Ninth Circuit concluded that it is not proper under RICO to charge two predicate acts where one action violates two statutes. A pattern of racketeering activity requires "at least two acts of racketeering," 18 U.S.C. § 1961(5), not "at least two statutory offenses." The Eighth Circuit has also adopted this view holding that "the factor of 'continuity plus relationship' which Congress thought necessary to establish a pattern [cannot] be present where only a single act, albeit an act that violates two statutes, has been committed." *United States v. Kragness*, 830 F.2d 842, 861 (8th Cir.1987) (citations omitted). The courts' conclusions are consistent with the Second Circuit's warning that it would "disapprove any attempt by the government or a private plaintiff to go beyond Congress' intent and fragment an act that is plainly unitary into multiple acts in order to invoke RICO." *United States v. Indelicato*, 865 F.2d 1370 (2d Cir.1989) (en banc).

Here, plaintiffs allege a single set of misrepresentations as giving rise to two Rule 10b–5 violations. Although these statutory violations directly result from two separate actions—the sale of Plastics' shares and Polycast's issuance of debt securities to finance the purchase—both actions were undertaken in reliance on the same set of misrepresentations concerning Plastics' earnings. The defendants are alleged to have committed a single illegal act that, because of the plaintiffs' own actions, happened to have produced two statutory violations. Defendants' single set of fraudulent statements cannot be split into two separate acts of racketeering activity in this manner.

The Second Circuit's recent opinion in *United States v. Kaplan*, 886 F.2d 536 (2d Cir.1989) is not to the contrary. In *Kaplan*, the court reiterated its statement in *Indelicato* that "where in fact there are a number of different *acts*, each should be separately counted." *Kaplan*, at 542 (emphasis added). Accordingly, the court concluded that the defendant's two bribes, although offered simultaneously, were two distinct acts intended to influence two different political powers for different purposes, and thus could be separately counted for the purposes of proving a RICO pattern. In this case, the simple set of misrepresentations were directed only at inducing Polycast to purchase Plastics. While defendants may have known that Polycast and UPAC would place debt securities in connection with their purchase of Plastics, defendants did not make the allegedly false statements to cause plaintiffs to do so. Accordingly, defendants sale of Plastics' shares and plaintiffs' issuance of debt securities may not be regarded as two discrete predicate acts under RICO.

### 5. Mail and Wire Fraud

Plaintiffs' proposed complaint alleges that defendants committed at least 25 separate acts of mail and wire fraud in connection with the sale of Plastics, each a predicate act for the purposes of RICO. 18 U.S.C. § 1343 provides in part:

> Whoever, having devised or intended to devise any scheme or artifice to defraud ... transmits or causes to be transmitted by means of wire communication in interstate ... commerce, any signals or sounds for the purpose of executing such scheme or artifice,

shall be guilty of an offense against the United States. 18 U.S.C. § 1341 provides in part:

> Whoever, having devised or intended to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises ... for the purposes of executing such scheme or artifice ... places in any post office or authorized depository for mail, any matter or thing to be sent or delivered by the Post Office

commits a federal offense.

■ To allege a violation of the wire or mail fraud statute, it is necessary to show that (1) the defendants formed a scheme or artifice to defraud; (2) the defendants used the United States wires or mails or caused a use of the mails in furtherance of the scheme; (3) the defendants did so with the specific intent to defraud. *Shreiber Distributing v. Serv–Well Furniture Co.*, 806 F.2d 1393, 1399–1400 (9th Cir.1986) (citations omitted).

■ Rule 9(b) Fed.R.Civ.P. applies "with equal force to allegations of mail and wire fraud as predicate civil RICO offenses." *Rich–Taubman Associates v. Stamford Restaurant Operating Co.*, 587 F.Supp. 875 (S.D.N.Y.1984) (citation omitted). Plaintiffs must allege for each claim who used wire or mail services, the contents of the communication, when it was transmitted and to whom. *The Limited, Inc. v. McCrory Corp.*, 645 F.Supp. 1038, 1047 (S.D.N.Y.1986) In addition, the plaintiff must allege facts to show the communication furthered or contributed to the fraudulent scheme. *See Newman v. Rothschild*, 651 F.Supp. 160, 162 (S.D.N.Y. 1986). The mailing or wire communication need not be an essential element of the fraudulent scheme. Rather, "it is sufficient for the mailing to be incident to an essential part of the scheme, or a step in the plot." *Schmuck v. United States*, —— U.S. ——, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989) (citations omitted). Furthermore, it is not necessary that the mailing be made by the defendant to an alleged victim of the fraud or that the mailing itself contain fraudulent material. *Id.* 109 S.Ct. at 1449.

■ Defendants contend that Polycast's allegations are defective in various respects. They claim that the communications were not incidental to an essential part of the alleged scheme, that many of the allegations are impermissibly vague, and that plaintiffs have not demonstrated how the communications furthered the alleged scheme. Upon review of Polycast's twenty-three allegations of wire fraud, the Court concludes that these claims are sufficient to meet the particularity requirement of Rule 9(b), with the exception of those violations alleged in paragraphs 101 and 121 which are impermissibly vague with respect to when the communications took place. Many of the alleged communications involved the development of Plastics' earnings forecasts for inclusion in the allegedly fraudulent offering memoranda. That document was eventually sent to potential bidders and was intended to entice potential buyers like Polycast to enter the bidding process. As such, these communications were incident to an essential part of the fraudulent scheme. Other communications involved internal discussions that resulted in the downward revision of Plastics' earnings projections. The fact that Polycast did not rely on each of these allegedly fraudulent "superseded" projections in closing the deal is immaterial because "in a charge involving mail or wire fraud, it is not necessary to show that the scheme was successful or that the intended victim suffered a loss or that the defendants secured a gain." *Id.* 109 S.Ct. at 1400; *Armco*

*Indus. Credit Corp. v. SLT Warehouse Co.,* 782 F.2d 475, 482 (5th Cir.1986) (to find a violation of mail fraud statute it is not necessary that the victim have detrimentally relied on the mailed misrepresentations). It is enough that the projections were part of the defendants' scheme to induce Polycast to buy Plastics. The fact that these communications occurred among defendants or their employees does not make them deficient. *See Schmuck,* 109 S.Ct. at 1449.

■ The two acts of mail fraud alleged in paragraphs 99 and 100 were also incidental to an essential part of Uniroyal's scheme. Plaintiffs allege that on or about August 21, 1986, T.K. Sherk, an employee in Uniroyal's credit department, sent a letter to Polycast containing, *inter alia,* an analysis of Plastics' reserves from certain "doubtful" accounts receivable. Plaintiffs also allege that on or about August 22, 1986, Nevins sent a letter to Polycast's Vice President for Finance containing information about Plastics' inventory, accounts payable, payment terms with major suppliers and seasonal influences on working capital. A critical element of Uniroyal's alleged scheme to induce the purchase of Plastics at an inflated price was attracting a potential purchaser. Sherk's and Nevin's correspondence disclosing Plastics' accounts receivable and other information related to the company's operations were aimed at encouraging Polycast to purchase Plastics.

Accordingly, the Court concludes that plaintiffs have properly pled mail and wire fraud violations in each of the paragraphs cited in paragraphs 180 and 182 of the proposed complaint, with the exception of those set forth in paragraphs 101 and 121.

### B. *The "Pattern" Requirement*

■ Defendants contend that plaintiffs' motion to add a RICO claim must be denied as a matter of law as the allegations of the proposed amended complaint do not adequately plead a "pattern of racketeering activity." For the reasons set forth below, the Court concludes that plaintiffs have adequately alleged a pattern within the meaning of the RICO.

This case presents the "now familiar but still vexing issue" of what allegations sufficiently support a claim of a "pattern of racketeering activity" under RICO. *See Kaplan,* 886 F.2d at 538. A "pattern" under RICO "requires at least two acts of racketeering activity" within a ten year period. 18 U.S.C. § 1961(5). Recently, the Supreme Court elaborated on this definition, stating:

> In our view, Congress had a more natural and common sense approach to RICO's pattern element in mind, intending a more stringent requirement than proof of simply two predicates, but also envisioning a concept of sufficient breadth that it might encompass multiple predicates within a single scheme that were related and that amounted to, or threatened the continued likelihood of, continued criminal activity.

*H.J. Inc. v. Northwestern Bell Telephone Co.,* — U.S. ——, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989). The court noted that in determining "whether the predicates proved establish a threat of continued racketeering depends upon the specific facts of each case." *Id.* 109 S.Ct. at 2902 While requiring the lower courts to engage in a fact-specific, case-by-case analysis to determine the existence of a continuity sufficient to form a "pattern", the Court offered the following guidance:

> "Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition ... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long term criminal conduct.

*Id.*

The Second Circuit has stated that "what is required [to allege continuity] is that the complaint plead a basis from which it could

be inferred that the acts ... were neither isolated nor sporadic." *Beauford v. Helmsley*, 865 F.2d 1386, 1391 (2d Cir.1989) (en banc). For "the purposes of RICO, 'continuity' means that separate events occur over time and perhaps threaten to recur." *Procter & Gamble Company and Riverview Productions v. Big Apple Industrial Buildings, Inc.*, 879 F.2d 10, 17 (2d Cir.1989). Both the Second Circuit, and more recently, the Supreme Court have rejected the requirement of multiple schemes to show continuity. *Procter and Gamble, supra*, at 16; *H.J.*, 109 S.Ct. at 2901.

Courts that have wrestled with the "pattern" requirement since *H.J.* have focused on a variety of non-dispositive factors in their case-by-case analysis of what constitutes "continuity" sufficient to establish a pattern in a closed-ended scheme. *Airlines Reporting Corporation v. Aero Voyagers, Inc.*, 721 F.Supp. 579, 583 (S.D.N.Y.1989) (Sweet, J.). These factors include the duration of the racketeering acts, *see, e.g., West Mountain Sales, Inc. v. Logan Mfg. Co.*, 718 F.Supp. 1084 (N.D.N.Y.1989); the number of such acts, *see, e.g., Service Engineering Co. v. Southwest Marine, Inc.*, 719 F.Supp. 1500 (N.D.Cal.1989); *Atlas Pile Driving Co. v. DiCon Financial Co.*, 886 F.2d 986 (8th Cir.1989); the number of participants, *see, e.g., Peterson v. Philadelphia Stock Exchange*, 717 F.Supp. 332 (E.D.Pa.1989); and the number of victims, *see, e.g., Peterson*, 717 F.Supp. at 337; *Thacker Eng'g., Inc. v. Chicago Housing Auth.*, 1989 WL 84561 (N.D.Ill.1989). *Aero Voyagers*, 721 F.Supp. at 584.

In evaluating the sufficiency of a RICO pleading, the Court must "read the facts alleged in the complaint in the light most favorable to the plaintiffs." *H.J.*, 109 S.Ct. at 2906. A RICO claim may be dismissed at this stage of the litigation only if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *Id.* 109 S.Ct. at 2906.

Here, the complaint alleges twenty-three acts of mail and wire fraud, and three securities law violations: defendants' issuance of the fraudulent $13.3 million earnings forecast, misrepresentation of Plastics' 1987–90 earnings forecasts, and failure to disclose the cancellation of the Northrop contract.[4] The conduct allegedly took place over a period of eight and one half months. Unlike the complaint in *Aero Voyagers* which alleged a simple breach of contract claim based on numerous identical acts of mail fraud, the complaint alleges a complex, multi-faceted conspiracy to defraud executed by numerous officers and stockholders. Defendants allegedly defrauded Polycast in a variety of ways. That these separate fraudulent acts were aimed at a single goal, the sale of Plastics, is not dispositive in light of Supreme Court's rejection of a requirement of multiple schemes. Under these circumstances, the Court concludes that defendants have established a "pattern" of racketeering activity sufficient to state a claim under RICO.[5]

Defendants argue, citing *Barrows v. Forest Laboratories, Inc.*, 742 F.2d 54

---

4. Although plaintiffs' Proposed Complaint alleges additional predicate acts, the Court has determined that these allegations are legally deficient.

5. Defendants argue that because the allegations amount to a single victim-single injury scheme, they do not satisfy the continuity prong of the pattern requirement. Although other circuits have held that RICO claims alleging single victim, single injury schemes are insufficient, *see, e.g., Walk v. Baltimore and Ohio Railroad*, 847 F.2d 1100 (4th Cir.1988); *SK Hand Tool Corp. v. Dresser Industries*, 852 F.2d 936 (7th Cir.1988), the correctness of this view is an open question after *H.J.* and the Supreme Court's subsequent vacatur of two decisions articulating this posi-

tion. *See* 57 U.S.L.W. 3853 (*Walk v. Baltimore, supra* and *Marshall Silver Construction v. Mendel*, 835 F.2d 63 (3d Cir.1987)). Indeed, in a recent opinion interpreting *H.J.*, the Third Circuit in reversing the district court's dismissal of a RICO claim noted that "the district court concluded that the objective of defendants' alleged predicate acts ... was limited to the infliction of a single harm on a limited number of victims, and that plaintiffs would be unable to to prove the existence of a pattern." *Swistock v. Jones*, 884 F.2d 755, 758 (3d Cir.1989) The court held that "although this result may have been consistent with the law of this circuit as it stood [before *H.J.*], it is no longer tenable in light of *H.J.*" *Id.*

(2d Cir.1984), that the Court should nonetheless deny plaintiff's leave to add their RICO claim because to do so at this stage of the litigation would unduly prejudice them by allowing plaintiffs to change their theory of relief in order to pursue a "windfall" recovery. The Court disagrees.

*Barrows* was a non-RICO case in which plaintiffs sought leave to amend their original complaint seeking recission of a stock purchase agreement to add new theories of relief two and one-half years after the filing of the original complaint and after plaintiffs had sold all of the stock involved. The Second Circuit affirmed the district court's decision denying leave to amend citing the lower court's reasoning that the new claims "could significantly expand the scope of discovery at a time when the case should be ready for trial," and that they created "an imminent danger that plaintiff would seek to force a favorable settlement by abusive use of the discovery process." *Id.* at 58. The court held that the proposed amendments represented a radical shift from the recovery sought in the original complaint. Instead of demanding recission of the stock purchase agreement based on fraud, the new claims sought specific performance of the agreement in accordance with the alleged true market value of the stock at the time of the sale. The Second Circuit held that the district court was "justified in taking into account the unfairness to the [defendants] of suddenly transforming a lawsuit for rescission into a battle for such high stakes" due to the subsequent rise in the value of the stock. *Id.* at 58–59. The court was also concerned that the discovery necessary to prove the "real" market value of the stock would have been different from the discovery necessary to support the claim for rescission.

Here, by contrast, the stakes have been high from the outset. Polycast's initial complaint sought $75 million in actual damages. Defendants have thus had a powerful incentive to litigate this lawsuit from the start. Furthermore, as already discussed, discovery has, to some extent, focused on the issues involved in plaintiffs' proposed RICO claim. Accordingly, plaintiffs' motion to add a claim against all defendants is granted, subject to the Courts rulings set forth above on various elements of that claim.

### III. Defendant Weber's Motion to Dismiss Plastics' First Amended Counterclaims

As discussed above, on May 13, 1987 Polycast sued Albert Weber, among others, charging him with, *inter alia*, violations of the securities laws and common-law fraud. On January 13, 1988, Weber served counterclaims against Polycast and Plastics seeking damages for, among other things, breach of contract and wrongful discharge. Plastics served its own counterclaims against Weber on August 26, 1988 which it later amended. Weber now moves to dismiss Plastics' amended counterclaims.

### A. BACKGROUND

The Court accepts as true the allegations of the complaint as it must on a motion to dismiss. *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1244 (2d Cir.1987). Prior to the sale of Plastics on October 31, 1986, defendant Alfred Weber was employed by Plastics as Vice President and General Manager. On November 1, 1986, Weber became the President and Chief Executive Officer of Plastics. In February 1987, Plastics and Weber entered an employment contract dated November 1, 1986. The contract provided in part that Weber "shall be subject to the direction of the Board of Directors" of Plastics, and that Weber shall "devote all of his time and efforts to the performance of his duties" for Plastics. Amended Counterclaims ¶¶ 3–10.

Plastics alleges that after Polycast's purchase of Plastics and before May 12, 1987, representatives of Plastics, including Richard J. Schneider, President and CEO of Plastics, "made inquiries of Weber" about, among other things, "the possibility that frauds and other wrongs had been perpetrated against Polycast in connection with its purchase of Plastics." *Id.* at 11. Plastics claims that Weber failed to respond

truthfully and completely to these inquiries.

In particular, Plastics maintains that Weber "in substance" denied that frauds or other wrongs had been committed against Polycast and that he had been involved in them although he knew these denials were false. For example, Plastics alleges that one such failure to respond honestly took place during a conversation with Schneider, which, on information and belief derived from notes written by Weber, took place in November 1986. Those notes state:

> Spoke to RJS [Richard J. Schneider] who told me [Weber] that they, Polycast, felt that U. Inc. [Uniroyal, Inc.] had acted morally wrong ... I told him that I didn't agree. They [Polycast] had had a long time to look at UPC [Plastics] [and] that they "didn't have to buy the damn thing."

*Id.* at ¶ 13. Plastics alleges that during this conversation, Weber stated "in substance" that Uniroyal had not defrauded Polycast although Weber knew this statement was false. At no time during his tenure with Plastics did Weber disclose the alleged frauds against Plastics and Polycast set forth in the Third Amended Complaint which is largely incorporated by reference in the First Amended Counterclaims. Plastics also alleges, on information and belief, that Weber "took other affirmative steps intended to conceal from Plastics and Polycast the frauds ... committed against Polycast that are set forth in the Third Amended Complaint." *Id.* at ¶ 16.

In its First Counterclaim alleging fraud against Weber, Plastics maintains that in employing Weber subsequent to October 31, 1986, and in executing the employment contract, it relied on Weber's materially false and misleading representations and omissions concerning the frauds against Polycast and Plastics. In its Second Counterclaim, Plastics charges Weber with breach of his employment contract. Weber has moved to dismiss both claims, the first pursuant to Fed.R.Civ.P. 9(b) for failure to plead fraud with particularity, and the sec-

ond for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6). For the reasons set forth below, Court denies the motion in part and grants it in part.

## B. DISCUSSION

### 1. Count One: Allegations of Fraud

In order to satisfy the particularity requirement of Rule 9(b), allegations of fraudulent misrepresentations must specify time, place, speaker and content of the alleged misrepresentations. *DiVittorio,* 822 F.2d at 1247. More generally, the complaint must be specific enough to put the defendant on "fair notice of what the plaintiff's claim is and the grounds on which it rests." *Ross v. A.H. Robins,* 607 F.2d 545, 557 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). However, when a fraud claim is based upon a defendant's concealment of facts that the defendant had a duty to disclose, the complaint "need not detail affirmative false statements. It is enough under 9(b) for the complaint to allege those facts that were not disclosed." *Von Bulow v. Von Bulow,* 634 F.Supp. 1284, 1303 (S.D.N.Y.1986). This is so because "conduct which never occurred cannot be described with greater particularity other than to state that it did not occur." *Cottman Transmission Systems, Inc. v. Dubinsky,* 95 F.R.D. 351, 353 (E.D.Pa.1982). The court will review each allegation of fraud in turn.

The allegations contained in paragraphs 11 and 12 of the complaint are impermissibly vague as to when Weber fraudulently denied knowledge of the wrongs perpetrated against Plastics. The complaint states only that the statements were made "subsequent to October 31, 1986 and before May 12, 1987," and "both before and after execution of the Employment Contract." Plastics has merely identified Weber's entire tenure as an employee of the company. Rule 9(b) requires more, especially in this context where, because of the employment relationship, Weber and Schneider could be expected to have had numerous communications. *See Zucker v. Katz,* 708 F.Supp. 525, 531 (S.D.N.Y.1989)

(allegations that defendant made false statements "in 1979", "in or about 1981", "every few months", and "in or about December 1986", in the context of an employment relationship were not sufficiently particular to pass 9(b) scrutiny). The time Weber made these statements is critical since Plastics alleges that it relied on those statements in entering into an employment contract with Weber in February 1987. If the statements were made after that date, reliance could not have occurred. Weber is entitled to know more specifically when these statements were made in order to prepare his defense.

■ The allegations of paragraph 16 also fail to meet the particularity requirements of Rule 9(b). Plastics' bare allegation that "upon information and belief, Weber took other affirmative steps intended to conceal from Plastics and Polycast the frauds and other wrongs committed against Polycast", gives Weber no notice at all as to what steps he took, where or when they took place, nor how these unidentified actions misled Plastics.

Accordingly, the allegations of paragraphs 11, 12 and 16 are dismissed without prejudice. Plastics is granted thirty days to replead.

■ The remaining allegations of Count One satisfy Rule 9(b). Paragraph 13 sufficiently identifies two allegedly fraudulent statements. The fact that Plastics identifies one of those statements by referring to its "substance" is not fatal. Rule 9(b) does not require a plaintiff to plead exact quotations. *See, e.g., Jubran v. Musikahn Corp.*, 673 F.Supp. 108, 112 (E.D.N.Y.1987). In addition, a reasonable trier of fact could find Weber's statement that Uniroyal had not acted "morally wrong" to be a fraudulent assertion of fact. Indeed, the New York Court of Appeals held that an employee's statement that "he had done nothing wrong" was a fraudulent failure to disclose a material fact. The Court explained that where such a statement is concerned, "the distinction between concealment and affirmative misrepresentation fade into legal insignificance, both being fraudulent." *Hadden v. Consolidated Edison Co. of N.Y.*, 45 N.Y.2d 466, 410 N.Y.S.2d 274, 276, 382 N.E.2d 1136, 1138 (1978).[6] The allegation sufficiently identifies the time these statements were allegedly made.

■ Paragraphs 14 and 15 are similarly well pled. Plaintiffs have adequately identified the facts they allege Weber fraudulently concealed by referencing the paragraphs of Polycast's Third Amended Complaint which contain adequately particularized descriptions of the frauds in which Weber is alleged to have participated. First Amended Counterclaims at ¶¶ 5, 14, 15.

Accordingly, Weber's motion to dismiss Count One of Plastics First Amended Counterclaims is granted with respect to paragraphs 11, 12 and 16, with leave to replead in thirty days and is denied in all other respects.

### 2. Count Two: Breach of Contract

■ Upon review of the relevant clauses of the employment contract and the submissions of the parties, the Court concludes that, although Plastics has failed to state a claim for breach of contract based on the express provisions of Weber's employment contract, it has stated a claim for breach of contract against Weber based on his implied common law duty of good faith. Aside from any duties expressly imposed or undertaken by an employee in a contract of employment, New York law imposes a duty on an employee to "at all times … exercise the utmost good faith in the performance of his duties." *Hadden*, 410 N.Y.S.2d at 276, 382 N.E.2d at 1138 (citation omitted); *see also* 52 N.Y.Jur.2d, Employment Relations § 205–207. Failure to disclose material facts to the employer is a violation of that implied duty. *Id.* Accordingly, Weber's motion to dismiss Count Two of Plastics' First Amended Counterclaims is denied.

### *Conclusion*

For the reasons set forth above, the Court denies the C & D defendants' motion

---

**6.** Weber's employment contract states that it is governed by New York law. *See* Amended Counterclaims of Defendant Alfred Weber, Exh. A, § 18.

to dismiss the First, Second, Third and Fourth Claims of the Third Amended Complaint as against them. The Court grants plaintiffs' motion for leave to file an amended complaint in part, and denies it in part and awards defendants certain costs in connection with these amendments. The Court denies the C & D defendants' motion to dismiss the First through Fifth claims of the Proposed Fourth Amended Complaint as against them. The Court grants Weber's motion to dismiss Plastics' counterclaims against him in part, and denies it in part.

SO ORDERED.