COM–TECH ASSOCIATES, a Connecticut Limited Partnership, by all its Limited Partners, and Martin Warshauer, Philip K. Hills, Jr., Norman J. Peer, Renato Valente, Robert Haskell, John Sommers, Frederic S. Elliot and Edwin Lichtig, Individually, Plaintiffs,

v.

COMPUTER ASSOCIATES INTERNATIONAL, INC., Charles B. Wang, Anthony W. Wang, Arnold S. Mazur, Abraham Poznanski and Peter Schwartz, Defendants.

No. CV–87–3355 (ADS).

United States District Court, E.D. New York.

Dec. 31, 1990.

Meister Leventhal & Slade by Jeffrey C. Slade, Alan Vinegrad, Laura F. Dukess, New York City, for plaintiffs.

Berlack, Israels & Liberman Co-counsel for Defendants by Martin S. Siegel, Melissa M. Johnson, New York City, Riker, Danzig, Scherer & Hyland by Benjamin P. Michel, Janet F. Moss, Morristown, N.J., for defendants.

## OPINION AND ORDER

SPATT, District Judge.

Before the Court at this time is the culmination of a series of motions made by the parties, all of which center around a dispute over the development, ownership and marketing of a computer tape management system for IBM Model 360 and 370 computers. Although the factual morass involving computer technology make this contentious litigation even more complex, the motions presented may be reduced to three categories: (1) the defendants' motions to compel arbitration, for judgment on the pleadings on the RICO claims, to dismiss the state-law claims, to strike the allegations in the complaint for punitive damages and for summary judgment based on the statute of limitations; (2) the plaintiffs' motion for partial summary judgment on the fourteenth claim for relief; and, (3) the defendants' appeal of the Magistrate's order on a discovery ruling.

## I. FACTUAL BACKGROUND

The following background facts are relevant to all motions pending before the Court, and are necessary for a general understanding of the relationship of the parties and the events that led to the commencement of this lawsuit.

Plaintiff Com–Tech Associates is a limited partnership organized under the laws of Connecticut, comprised of the individual plaintiffs as limited partners (collectively referred to as "COM–TECH"). The general partner of COM–TECH is Com–Tech, Inc., a wholly owned corporate subsidiary of the defendant Computer Associates International, Inc. COM–TECH was formed in 1978 in order to provide funding from investors—the individual plaintiffs—for the development, ownership and marketing of a computer software program known as "CA–DYNAM/T–OS".

The defendant Computer Associates International, Inc. ("COMPUTER ASSOCIATES"), is a Delaware corporation with its principal place of business in Garden City, New York. Formerly known as Trans–American Computer Associates, Inc. ("TRANS–AMERICAN"), it obtained its present name in 1980 when it acquired substantially all of the assets of its parent company Computer Associates International, Ltd. ("CA LTD."), a Swiss corporation. As stated above, COMPUTER ASSOCIATES' wholly owned subsidiary, Com–Tech, Inc., is the general partner in the plaintiff COM–TECH partnership.

The CA–DYNAM/T–OS is a computer tape management program which allows computer users of the "OS" and "OS/VS" operating system to efficiently manage and maintain security and control over all computer data tapes operating on IBM Model 360 and 370 computers.

When COM–TECH was initially formed in 1978, the individual plaintiff limited partners contributed 99% of the capital, namely, the sum of $212,500, toward the development of the program. The limited partners also obligated themselves in promissory notes to pay an additional $212,500 over the next four years for development, for a total investment of $425,000. These limited partners, in turn, were to collectively receive 99% of the interest in any income realized by COM–TECH from the marketing, licensing, use or maintenance of the CA–DYNAM/T–OS program. Com–Tech,

Inc., the general partner, retained the remaining 1% interest.

On October 30, 1978, the date the COM–TECH partnership was formed, COM–TECH and CA LTD.—that is, COMPUTER ASSOCIATES' former parent corporation—entered into a System Development Agreement ("System Agreement"), whereby CA LTD. was to use its "best efforts" to develop and deliver the completed CA–DYNAM/T–OS program to COM–TECH by December 31, 1978.

In addition, on that same date, COM–TECH and TRANS–AMERICAN (now COMPUTER ASSOCIATES),[1] entered into a Marketing Agreement which provided that COM–TECH was to own the CA–DYNAM/T–OS program once it was developed and turned over by CA LTD. In addition, the Agreement provided that TRANS–AMERICAN was granted the exclusive right to distribute the program world-wide and was required to use its "best efforts" to market the program. TRANS–AMERICAN was also required to pay COM–TECH royalties from payments received through the licensing or maintenance of the program through 1998 as follows:

17%..........until the partnership was paid $215,000 in royalties;

15%..........after the initial payment of $215,000, and until June 30, 1984;

2%..........until December 31, 1988; and,

1%..........until December 31, 1998.

By the express terms of the Agreement, TRANS–AMERICAN could not · share in these royalties, but was permitted to retain all receipts other than royalty payments.

CA LTD. did not complete the development of the CA–DYNAM/T–OS program in 1978 as required by the System Agreement and, accordingly, marketing by TRANS–AMERICAN also did not commence. In late 1979, the defendants urged the COM–TECH limited partners to acquiesce in an extension of time within which COMPUTER ASSOCIATES (*i.e.*, CA LTD. and TRANS–AMERICAN), was required to develop and market the CA–DYNAM/T–OS program. COM–TECH agreed to a modification of the Marketing Agreement sometime in 1980 ("1980 Modification Agreement"). The 1980 Modification Agreement included a new method of calculating royalties due to COM–TECH, which was allegedly more favorable to COMPUTER ASSOCIATES than the earlier Marketing Agreement.

COM–TECH alleges that these changes in the Marketing Agreement which resulted in the 1980 Modification Agreement were. fraudulently induced based on the defendants' misrepresentations as to the developments in the computer industry at that time, and of the slow development of the CA–DYNAM/T–OS program. COM–TECH also alleges that from about 1982 to the present, COMPUTER ASSOCIATES willfully underreported, or intentionally failed to report, the actual receipts from the marketing and licensing of the CA–DYNAM/T–OS program. According to COM–TECH, both the fraudulent inducement to enter into the 1980 Modification Agreement and the willful, gross underreporting and misrepresentations of the actual receipts, constitute an overall scheme to defraud COM–TECH out of millions of dollars in royalties owed to it.

On September 30, 1987, COM–TECH and its limited partners commenced this action alleging that COMPUTER ASSOCIATES engaged in a scheme to defraud COM–TECH by unlawfully converting royalty payment receipts. COM–TECH alleges it was defrauded by COMPUTER ASSOCIATES in primarily two ways: (1) COMPUTER ASSOCIATES intentionally misrepresented certain computer developments in the industry in order to induce the limited partners of COM–TECH to make the initial investment and the subsequent 1980 Modification Agreement; and, (2) COMPUTER ASSOCIATES issued fraudulent reports as

**1.** Although "TRANS–AMERICAN" is a party to the Marketing Agreement, it is undisputed that in fact that entity is COMPUTER ASSOCIATES, and that TRANS–AMERICAN is simply the former name of COMPUTER ASSOCIATES. Accordingly, the Court uses the two names interchangeably.

to the marketing of the CA–DYNAM/T–OS program, by knowingly omitting more than $5 million in receipts, thus depriving the COM–TECH partnership of royalty income in the amount of approximately $1.5 million for a period of five years. COM–TECH is seeking to recover treble damages from COMPUTER ASSOCIATES based upon violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, as well as common-law fraud, breach of fiduciary duty and breach of contract. COM–TECH also seeks punitive damages and attorneys' fees.

## II. DISCUSSION

As stated at the outset, before the Court at this time are the following three sets of motions: (1) the motions of the defendants to compel arbitration, for judgment on the pleadings on the RICO claims, to dismiss the state-law claims, to strike the allegations in the complaint for punitive damages and for summary judgment based on the statute of limitations; (2) the motion of the plaintiffs for partial summary judgment on the fourteenth claim for relief; and, (3) the defendants' appeal from Magistrate David F. Jordan's order with regard to discovery matters. Each of these motions is discussed separately below, seriatim.

## (1) COMPUTER ASSOCIATES' MOTIONS

Defendant COMPUTER ASSOCIATES makes the following motions, each of which is discussed separately below: (a) motion to compel arbitration; (b) motion for judgment on the pleadings under Fed.R.Civ.P. 12(c) on claims one, two and three; (c) motion to dismiss claims four through fourteen under Fed.R.Civ.P. 12(h)(3) for lack of subject matter jurisdiction; (d) motion to strike the allegations of punitive damages pursuant to Fed.R.Civ.P. 12(f); (e) motion for summary judgment pursuant to Fed.R. Civ.P. 56(b) and (c), for summary judgment on claims one through four, and six through thirteen, based upon the statute of limitations.

(a) *Motion to Compel Arbitration:*

COMPUTER ASSOCIATES alleges that this entire dispute is subject to mandatory arbitration in accordance with the arbitration clause contained in COM–TECH's Partnership Agreement. Although this dispute arises specifically with regard to the Marketing Agreement which does not contain an arbitration clause, the defendants allege that the Marketing Agreement is an integral part of the Partnership Agreement and, therefore, that arbitration clause applies to all disputes that arise with regard to the provisions of the Marketing Agreement as well.

COM–TECH opposes submission of this dispute to arbitration on the following grounds: (1) the Marketing Agreement itself contains no arbitration clause; (2) Under paragraph 7.13 (*i.e.*, choice of law provision) of the Partnership Agreement, Connecticut law governs, which law does not permit "incorporation by reference" unless there is a clear indication of the parties' intent to do so; and, (3) even if this dispute is subject to mandatory arbitration, COMPUTER ASSOCIATES has waived its right to compel arbitration since it has actively participated in this litigation for nearly two years before even raising the issue.

Agreement to Arbitrate.

■ The arbitration clause contained in the Partnership Agreement provides in relevant part:

> "*Arbitration.* Any dispute arising under, out of, in connection with, or in relation to this Agreement, or any breach hereof, shall be determined and settled by arbitration in the City of New York pursuant to the then obtaining rules of the American Arbitration Association" (Partnership Agreement ¶ 7.12).

It is undisputed that the parties have agreed to arbitrate any disputes arising out of the Partnership Agreement. It is also undisputed that the Marketing Agreement is silent as to arbitration. The issue, therefore, is this: does the agreement to submit any disputes to arbitration that arise "under, out of, in connection with, or in relation to" the Partnership Agreement also

encompass disputes that arise out of the Marketing Agreement?

■ Although the Partnership Agreement expressly states that Connecticut law governs disputes arising under that Agreement (*see* ¶ 7), federal rather than state law governs the question of whether this dispute is subject to arbitration, since the Agreement clearly evidences transactions involving or affecting interstate commerce (*see Graphic Scanning Corp. v. Yampol*, 850 F.2d 131, 133 [2d Cir.1988], citing *Southland Corp. v. Keating*, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 [1984]).

Firmly entrenched in federal law is the strong policy favoring arbitration agreements (*Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 [1983]). In construing arbitration agreements, the courts have distinguished between "broad" and "narrow" ones, the former submitting "any and all" disputes to arbitration, the latter dealing with only specific types of disputes (*see McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 832 [2d Cir.1988] [collecting cases]). It is undisputed that the arbitration clause contained in the Partnership Agreement at issue here is considered a "broad" one. That is, it encompasses "[a]ny dispute arising under, out of, in connection with, or in relation to" the Partnership Agreement. With a broad arbitration clause, "the strong federal presumption in favor of arbitrability applies with greater force" (*McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co., supra*, 858 F.2d at p. 832, citing *AT & T Technologies, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 [1986]).

All three agreements, namely, the Partnership Agreement, the Marketing Agreement and the System Agreement were all executed at or about the same time in October 1978. In fact, the System and Marketing Agreements are both physically attached to the Partnership Agreement as Exhibits "A" and "B", respectively. The Marketing and System Agreements are re-peatedly referenced throughout the Partnership Agreement. The actual stated purpose of the COM–TECH limited partnership is to, *inter alia*, enter into the System and Marketing Agreements in order to market the computer system described in the System Agreement. Furthermore, the arbitration clause itself contemplates arbitration of disputes "in connection with, or in relation to" the Partnership Agreement. Also most, if not all of the issues raised by the plaintiffs in this forum are arbitrable, especially in light of the Supreme Court decision in *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), which expressly held that civil RICO claims are subject to an arbitration clause.

Although the Marketing Agreement itself fails to specifically provide for arbitration, the circumstances of this case, the relationship of the parties and the strong federal policy favoring arbitration compels the Court to conclude that this dispute arising out of the Marketing Agreement is also subject to arbitration (*see S.A. Mineracao Da Trindade–Samitri v. Utah Int'l, Inc.*, 745 F.2d 190, 195–96 [2d Cir.1984]). Based on the totality of the circumstances, coupled with the strong federal policy favoring arbitration, the Court finds that the Partnership Agreement, which governs the rights and obligations of the parties of the COM–TECH relationship, constituted an "umbrella" for both the System and Marketing Agreements, since all three agreements are interrelated and dependent on each other (*see S.A. Mineracao Da Trindade–Samitri v. Utah Int'l, Inc., supra*, 745 F.2d at p. 196; *accord Bayly, Martin & Fay, Inc. v. Glaser*, 92 A.D.2d 850, 460 N.Y.S.2d 575 [1st Dep't] [disputes arising out of stock purchase agreement are subject to arbitration clause contained in separate employment agreement since both agreements were part of interrelated package of contracts], *aff'd*, 60 N.Y.2d 577, 454 N.E.2d 124, 467 N.Y.S.2d 43 [1983]). Accordingly, the Court finds this dispute arising out of the Marketing Agreement is subject to the broad arbitration clause contained in the Partnership Agreement.

The Court must next determine, however, whether COMPUTER ASSOCIATES waived its right to enforce the arbitration provision.

Waiver.

■ Since this case does not involve the effect of executing an express waiver of the right to compel arbitration (*cf. Gilmore v. Shearson/American Express Co.,* 811 F.2d 108, 112–13 [2d Cir.1987]), the starting point of the waiver analysis necessarily begins with the leading case of *Rush v. Oppenheimer & Co.,* 779 F.2d 885 (2d Cir. 1985). In *Rush,* Judge Pratt stated that "waiver of the right to compel arbitration due to participation in litigation may be found only when prejudice to the other party is demonstrated" (779 F.2d at p. 887 [citations omitted]). In *Rush,* the Court stated that expense, delay, participation in discovery and the failure to raise arbitration as a defense in the answer, standing alone, will not necessarily support a waiver of a right to compel arbitration because of the strong overriding federal interest, in that the primary focus on the issue of waiver is whether there has been prejudice to the party opposing arbitration (779 F.2d at p. 887).

In *Rush,* the plaintiff commenced a securities fraud action in federal court on May 10, 1984, despite the existence of an express arbitration agreement between the parties. Ruling on the defendant's motion to compel arbitration made on December 31, 1984, the District Court held that the defendant's acts constituted a waiver of any right to arbitrate in light of the discovery that had taken place, the defendant having made a prior motion to dismiss and having engaged ·in eight months of litigation (*see* 606 F.Supp. 300, 301 [S.D.N.Y. 1985]). The Second Circuit reversed, finding that none of the factors relied upon by the District Court supported a finding of a waiver under the facts of that case in light of the strong federal policy favoring arbitration (*see* 779 F.2d at p. 887). Focusing on the primary area of concern in a waiver case, the court found that the plaintiff failed to demonstrate prejudice.

In *Rush,* Judge Pratt commented on two prior significant cases in the area of waiver, namely, *Demsey & Assocs., Inc. v. S.S. Sea Star,* 461 F.2d 1009 (2d Cir.1972) and *Bengiovi v. Prudential–Bache Secs., Inc.,* Fed.Sec.L.Rep. [CCH] ¶ 92,012, 1985 WL 2143 (D.D.C. Apr. 25, 1985). In *Demsey, supra,* there was a trial on the merits prior to the motion to compel arbitration resulting in a ·finding of a waiver. In *Bengiovi,* prior to a trial, the defendant answered, engaged in discovery, and moved for partial summary judgment. The District Judge in *Bengiovi* held that the delay and expense of having to defend the summary judgment motion resulted in a waiver. Significantly, in this Court's view, Judge Pratt commented on *Bengiovi,* decided just prior to *Rush,* in the following manner:

> "Moreover, the instant case is distinguishable from *Bengiovi v. Prudential–Bache Securities, Inc.,* —— F.2d —— [Current] Fed.Sec.L.Rep. (CCH) ¶ 92,012 (D.D.C. April 25, 1985).... After answering, defendants participated in several discovery procedures and, ultimately, moved for partial summary judgment.... The district court denied the motion, holding that the plaintiff had been prejudiced by defendant's delay in seeking arbitration. *The defendant in Bengiovi, however, had already put plaintiff to the expense of having to defend a motion for partial summary judgment, and it had moved for arbitration eight and one-half months after answering* the complaint and· *only four and one-half weeks before trial—much later in the litigation than defendants' motion here.* Moreover, the ·delay in that case was in no way attributable, as here, to the· district judge's change of heart on the important issue of punitive damages. Thus, the expense and delay in the present case fall well short of what the *Bengiovi* court found sufficient to constitute a waiver of arbitration" 779 F.2d at p. 888 (emphasis supplied).

Mindful that a waiver of arbitration " 'is not to be lightly inferred' " (*Rush, supra,* 779 .F.2d at p. 887, quoting *Carcich v.*

*Rederi A/B Nordie,* 389 F.2d 692, 696 [2d Cir.1968]), and that a party opposing a motion to compel arbitration on that ground bears a heavy burden (*see McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co., supra,* 858 F.2d at p. 833 ["strong federal presumption against the waiver of such rights"]), the unusual circumstances and events that have thus far taken place in this protracted litigation compel the Court to conclude that this is one of those rare cases in which the defendants' conduct resulted in prejudice to the plaintiffs supporting the doctrine of waiver of the right to compel arbitration.

Before proceeding to the waiver analysis in this case, the Court will review the factual background. This action was commenced on September 30, 1987. The defendants answered and raised nine separate defenses, but failed to raise the arbitration defense. An Amended Complaint was later served, to which the defendants served an Amended Answer with defenses, again without raising the arbitration defense. The parties then engaged in extensive pretrial discovery for nearly two years before the issue of arbitration was finally raised in this motion, which was brought concurrently with the defendants' other motions, including one for summary judgment, going to the merits of the action. At the time this motion was initially made in May 1989, at least ten depositions, including seven of the plaintiffs, had been taken, and several sets of lengthy interrogatories were served, all relating to claims that are arbitrable.[2] Voluminous discovery motions were made and ruled upon by the Magistrate. No pre-answer motion to dismiss was ever made raising the arbitration defense. Both parties filed extensive proposed pretrial orders in October 1989 when this case was pending before Judge Reena Raggi. Significantly, the defendants stated in their proposed pretrial order that they expected to try the case "in the December 1989 term" before Judge Raggi.

Applying the principles of *Rush* to the facts of this case, there is, on review of this record, evidence of serious prejudice to the plaintiffs and an implicit abandonment and waiver of the right to compel arbitration by the defendants, notwithstanding the strong federal policy considerations. This Court determines that the facts in this case fit within the *Bengiovi* waiver commented on by Judge Pratt, for the following reasons:

(1) There was a substantially longer period of discovery, namely approximately twenty months.

(2) There was a substantially greater expense incurred by the plaintiffs, including the defense of a motion for summary judgment.

(3) Discovery in *Rush* related to claims not subject to arbitration. Here, discovery is virtually complete, and included discovery on claims subject to the purview of the arbitration clause. Parenthetically, much of the discovery would not have been permitted in the arbitration forum.

(4) Unlike *Rush*, but similar to *Bengiovi*, the defendants moved for summary judgment and to dismiss the complaint on the merits of claims which were all subject to arbitration.

(5) The defendants submitted a proposed pretrial order in October 1989, which contains a list of defenses to the litigation, uncontested facts, exhibits, estimated trial time and the following statements:

"15. This is a jury case.

16. The case will be tried in the December 1989 term."

(6) There was no "excusable delay" as there was in *Rush*.

Reviewing these facts, any reasonably prudent litigator had to believe that there was an intentional abandonment of the right to compel arbitration. To hold otherwise under these circumstances would mean that a waiver could not result unless, like in *Demsey, supra,* the case proceeded to an actual plenary trial on the merits. Here, the near completion of discovery, the filing of the proposed pretrial order, the discussion of a trial date and the extensive

---

**2.** Since the parties did not seek a stay of discovery during the pendency of these motions, presumably discovery continued after the filing of these motions.

motions made by the defendants, including one for summary judgment, going to the merits, has caused prejudice to the plaintiffs if they are now forced to arbitrate. This determination is, in this Court's view, not only within the parameters of *Rush*, but is in accord with authoritative precedent outside this Circuit as well (*see, e.g., Price v. Drexel Burnham Lambert, Inc.*, 791 F.2d 1156, 1160–62 [5th Cir.1986]; *Bengiovi v. Prudential–Bache Secs., Inc.*, Fed. Sec.L.Rep. [CCH] ¶ 92,012 [D.D.C. Apr. 25, 1985]; *Faircloth v. Jackie Fine Arts, Inc.*, 682 F.Supp. 837, 841 [D.S.C.1988]; *see generally Domke on Commercial Arbitration* § 19:01 [G. Wilner rev. ed. 1984 & Supp.1990]).

Accordingly, the defendants' motion to compel arbitration is denied on the ground of a waiver of the right to compel arbitration.

(b) *Motion for Judgment on the Pleadings on Claims One through Three (RICO):*

Claims one, two and three of COM-TECH's Amended Complaint allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, which form the basis of federal jurisdiction for this action. COMPUTER ASSOCIATES moves for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) on numerous grounds. The Court first discusses the standard of review on a motion for judgment on the pleadings, then the general pleading requirements for a civil RICO action, and finally the various challenges made by the defendants to the RICO claims contained in the Amended Complaint.

Standard of Review.

The applicable standard of review on a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) is the same as that on a motion to dismiss under Fed.R.Civ.P. 12(b)(6) (*see Shaw v. Rolex Watch U.S.A., Inc.*, 745 F.Supp. 982, 984 [S.D.N.Y. 1990], citing 5A C. Wright & A. Miller, *Federal Practice and Procedure* § 1367, at p. 518–19 [2d ed. 1990]). That is, "the court should not dismiss the complaint pursuant to Rule 12(b)(6) unless it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief' " (*Goldman v. Belden*, 754 F.2d 1059, 1065 [2d Cir.1985], quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 [1957]; *see also H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 [1989] [applying standard in context of civil RICO action]). In addition, such a motion is addressed solely to the face of a pleading, and "[t]he court's function ... is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient" (754 F.2d at p. 1067). In assessing the sufficiency of a pleading on a motion to dismiss, it is well settled that the court must, of course, accept the allegations of the complaint as true (*see Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10, 14 [2d Cir.1989], *cert. denied*, —— U.S. ——, 110 S.Ct. 723, 107 L.Ed.2d 743 [1990]), and draw all reasonable inferences favorably to the plaintiff (*see Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 [1974]; *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1099 [2d Cir.1988], *cert. denied sub nom. Soifer v. Bankers Trust Co.*, 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 [1989]).

Elements of a RICO Cause of Action.

Section 1962 of RICO makes it unlawful to: (a) invest income "derived from a pattern of racketeering activity" in an interstate enterprise; (b) acquire or maintain an interest or control in an enterprise "through a pattern of racketeering"; (c) participate in the conduct of an enterprise's affairs "through a pattern of racketeering"; or (d) conspire to violate any of these substantive prohibitions (*see* 18 U.S.C. § 1962). Section 1964(c) creates a private right of action.

The plaintiffs' Amended Complaint alleges violations of 1962[c] (First Claim for Relief); 1962[b] (Second Claim for Relief); and 1962[d] (Third Claim for Relief).

The threshold pleading requirements of a private action under section 1962 of RICO

were set forth in *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5 (2d Cir.1983), *cert. denied sub nom. Moss v. Newman*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984), as follows:

> "To state a claim for damages under RICO a plaintiff has two pleading burdens. First, he must allege that the defendant has violated the substantive RICO statute, 18 U.S.C. § 1962 (1976), commonly known as 'criminal RICO.' In so doing, he must allege the existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce.... Plaintiff must allege adequately defendant's violation of section 1962 before turning to the second burden —*i.e.*, invoking RICO's civil remedies of treble damages, attorneys fees and costs.... To satisfy this latter burden, plaintiff must allege that he was 'injured in his business or property *by reason of* a violation of section 1962' " (*id.* at p. 17 [citations omitted] ).

The defendants challenge the sufficiency of the RICO claims alleged in the Amended Complaint on the following grounds, each of which is considered below: (1) the plaintiffs have alleged that they, and not the defendants are the RICO "enterprise"; (2) the allegations of underreporting royalties sound in contract rather than fraud; (3) the plaintiffs have failed to sufficiently allege a "pattern of racketeering activity", and also did not sustain economic injury from one of the predicate acts of mail fraud; (4) the plaintiffs failed to show that defendants acquired or maintained control in the enterprise through the acts of mail fraud; and, (5) the allegations of conspiracy under RICO are merely conclusory.

### i. Plaintiff as "Enterprise".

 COMPUTER ASSOCIATES contends that since the plaintiffs allege that they themselves are the "enterprise", the RICO claims must fall. In order to state a claim under section 1962(c), the plaintiffs must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity" (*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 [1985] ). "Enterprise", includes any "individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity" (18 U.S.C. § 1961[4] ). It "is generally a *group of persons* associated together for a common purpose of engaging in a course of conduct" (*Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc., supra*, 879 F.2d at p. 15 [emphasis in original] ). The existence of an entity is proven by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit" (*United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 [1981] ).

Contrary to the defendants' contentions, it has been held in the context of a 1962(c) action that "*plaintiffs* are free to allege that they or one of their members is a RICO enterprise or part of a RICO enterprise" (*United Energy Owners Committee, Inc. v. United States Energy Management Sys., Inc.*, 837 F.2d 356, 362 [9th Cir.1988] [emphasis supplied], citing *Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 194–95, n. 6 [9th Cir.1987]; *see also Temple Univ. v. Salla Bros., Inc.*, 656 F.Supp. 97, 101–02 [E.D.Pa.1986] [citing cases] ). Even though the plaintiffs themselves are also the "enterprise", it is permissible for the victimized enterprise to sue for damages under RICO, so long as it is alleged that the *defendants* conducted the enterprise through a pattern of racketeering activity (*see United Energy Owners Committee, Inc. v. United States Energy Management Sys., Inc., supra*, 837 F.2d at p. 362; *see also Jacobson v. Cooper*, 882 F.2d 717, 719–20 [2d Cir.1989] [complaint that alleged that the defendants "acquired or maintained, directly or indirectly, interest in or control over plaintiff's real estate enterprise ... through a pattern of racketeering activity" sufficiently alleged exist-

ence of "enterprise"]). This is consistent with the plain language of section 1962(c), as well as the policy behind section 1962 "to prevent racketeering activity from infiltrating *legitimate* business enterprises" (*First City Nat'l Bank and Trust Co. v. FDIC*, 730 F.Supp. 501, 506 [E.D.N.Y.1990] [McLaughlin, J.] [emphasis supplied]).

The Amended Complaint alleges that the plaintiff COM-TECH is the "enterprise" (*see* Amended Complaint ¶ 88). The plaintiffs also specifically allege that the "[d]efendants unlawfully, willfully and knowingly participated, directly and indirectly, in the conduct of the affairs of Com-Tech Associates through the pattern of racketeering activity" (Amended Complaint ¶ 93), which predicate acts are described in detail elsewhere in the pleading (*see, e.g.,* Amended Complaint ¶¶ 37–44, 52–84). In this Court's view, the plaintiffs have sufficiently alleged the "enterprise" element to withstand a motion to dismiss (*see Jacobson v. Cooper, supra,* 882 F.2d at pp. 718–20).

Accordingly, the defendants' motion to dismiss the RICO claims on the ground that the plaintiff cannot also be the "enterprise", is denied.

*ii. Underreporting Royalties as Fraud.*

█ The defendants contend that even assuming the truth of the Amended Complaint, the allegations of underreporting revenues or royalties amounts only to a breach of contract at most, and does not constitute fraud as a predicate act to support a civil RICO action.

Sections 1962(b) and (c) of RICO prohibit conducting the affairs of an enterprise, as well as acquiring an interest in an enterprise, through a "pattern of racketeering activity". "Racketeering activity" refers to the predicate acts necessary to sustain a RICO claim. The predicate acts include, *inter alia,* violent crimes (*e.g.,* murder, kidnapping), pornography, narcotics trafficking, gambling, embezzlement, securities fraud, mail fraud and wire fraud (*see* 18 U.S.C. § 1961[1]). If mail and/or wire fraud are relied upon to supply the predicate acts, then the plaintiff must plead

fraud with particularity (*see* Fed.R.Civ.P. 9[b]). The purpose of the particularity requirement is threefold: first, to afford the defendant notice of the factual basis of the alleged fraud; second, to safeguard a defendant's goodwill and reputation from unfounded charges of wrongdoing; and third, to deter strike suits (*Ross v. Bolton,* 904 F.2d 819, 823 [2d Cir.1990]).

In *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 49–50 (2d Cir.1987), Judge Newman described the applicable standard in pleading mail or wire fraud as predicate acts under RICO, as follows:

"In general, the mail and wire fraud statutes require, *inter alia,* a showing of intentional fraud ... [and] plaintiffs must ... provide some factual basis for conclusory allegations of intent.... These factual allegations must give rise to a 'strong inference' that the defendants possessed the requisite fraudulent intent.

\* \* \* \* \* \*

A common method for establishing a strong inference of scienter is to allege facts showing a motive for committing fraud and a clear opportunity for doing so.... Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, ... though the strength of the circumstantial evidence must be correspondingly greater" (citations omitted).

COM-TECH alleges instances of mail fraud under 18 U.S.C. § 1341 as the predicate racketeering acts in that COMPUTER ASSOCIATES used the mails to further their scheme to defraud the plaintiff limited partners by sending false and fraudulent letters, royalty statements and royalty reconciliation reports. These documents allegedly intentionally misrepresented developments in the computer industry and concealed the actual receipts received by the defendants for marketing the program (*see* Amended Complaint ¶ 90). The plaintiffs further allege that the defendants collectively engaged in a continuous pattern of fraud and misrepresentations to the detriment of the plaintiff limited partners by

secreting royalties owed to the COM–TECH limited partners, allegedly in the sum of millions of dollars.

Among these allegations are that shortly after the formation of COM–TECH, the defendants misrepresented to the plaintiffs facts concerning the development of the plaintiffs' product and the events and developments in the computer software industry. In addition, the plaintiffs allege that they were fraudulently induced by COM–TECH into executing the 1980 Modification Agreement, which significantly altered the royalty payment calculations. Further, COM–TECH alleges that COMPUTER ASSOCIATES continuously and willfully underreported the actual amount of receipts from marketing and licensing the program, thus defrauding the COM–TECH limited partners of millions of dollars in royalties. According to the plaintiffs, this was accomplished through a series of approximately twenty-five letters, royalty statements and royalty reconciliation reports containing fraudulent statements, all of which were mailed to the limited partners. It is alleged that all of these mailings containing false and fraudulent representations were done to further the defendants' overall scheme to defraud the plaintiff limited partners of royalties over the course of several years. Taking the allegations of the complaint as true as this Court must on a motion to dismiss (*see Conley v. Gibson, supra*), the claims as alleged give rise to a strong inference that the defendants possessed the requisite intent and, clearly sound in "fraud", rather than merely "breach of contract" as the defendants suggest.

Any doubt as to whether commercial business fraud is subject to the provisions and liabilities of civil RICO has been laid to rest in (*Sedima, S.P.R.L. v. Imrex Co., supra*, 473 U.S. at pp. 497–98, 105 S.Ct. at pp. 3285–86). As in this case, *Sedima* involved a dispute between two companies that entered into a joint business venture, one of which alleged it was being cheated and overbilled by the other. In reversing the dismissal of the complaint, the Supreme Court rejected the argument that a prior conviction was necessary to sustain a rack-

eteering act, reasoning that "RICO is to be read broadly" (473 U.S. at p. 497, 105 S.Ct. at p. 3285). In fact, the *Sedima* Court noted that as of 1984, thirty-seven percent of all civil RICO cases at the trial court level involved "common-law fraud in a commercial or business setting" (473 U.S. at p. 499 n. 16, 105 S.Ct. at p. 3286 n. 16). Thus, *Sedima* makes clear that the "garden variety" fraud in a commercial setting can transform an "ordinary" business dispute into a civil RICO action, so long as the essential elements of section 1962 are satisfied.

Accordingly, for purposes of this motion to dismiss, COMPUTER ASSOCIATES' argument that COM–TECH is merely attempting to convert a "commercial fraud" into a federal civil RICO action is without merit, and that ground for dismissal is denied. The Court finds that COM–TECH has sufficiently alleged the commission of two or more predicate acts of mail fraud under RICO in its Amended Complaint.

### iii. "Pattern of Racketeering Activity".

■ The defendants next contend that even assuming the existence of predicate acts, the plaintiffs have failed to sufficiently allege a "pattern of racketeering activity" as required by section 1962.

■ A "pattern" requires at least two acts of "racketeering activity", occurring within ten years of each other (18 U.S.C. § 1961[5]). Both the Supreme Court and Second Circuit have held that two acts of "racketeering activity", without more, is *not* sufficient to establish a "pattern" (*see H.J. Inc. v. Northwestern Bell Tel. Co., supra*, 109 S.Ct. at pp. 2900–02; *see also United States v. Indelicato*, 865 F.2d 1370, 1381 [2d Cir.] [*en banc*], *cert. denied*, —— U.S. ——, 110 S.Ct. 56, 107 L.Ed.2d 24 [1989]). In particular, to form a "pattern" of racketeering, the predicate acts must be related and constitute a threat of continued racketeering activity (*H.J. Inc. v. Northwestern Bell Tel. Co., supra*, 109 S.Ct. at pp. 2900–02), which is to be determined on a case-by-case basis (109 S.Ct. at p. 2902). As the Court in *H.J. Inc.* held:

"In our view, Congress had a more natural and common sense approach to RICO's pattern element in mind, intending a more stringent requirement than proof of simply two predicates, but also envisioning a concept of sufficient breadth that it might encompass multiple predicates within a single scheme that were related and that amounted to, or threatened the continued likelihood of, continued criminal activity" (109 S.Ct. at p. 2899).

■ Therefore, in order to show "continuity", there is no requirement that multiple *schemes* to defraud be demonstrated, rather only multiple *predicates* within a single scheme (*H.J., Inc., supra,* 109 S.Ct. at p. 2901; *Procter & Gamble, supra,* 879 F.2d at p. 16). Rather, since *H.J., Inc.,* courts have looked to a variety of factors on a case-by-case basis to determine whether "continuity" has been sufficiently pled to satisfy the "pattern" element, such as the number and duration of acts, victims and/or participants (*see Polycast Technology Corp. v. Uniroyal, Inc.,* 728 F.Supp. 926, 948 [S.D.N.Y.1989] [collecting cases]).

As stated above, the predicate acts alleged include numerous instances of mail fraud (*see* 18 U.S.C. § 1341; Amended Complaint ¶ 90). The conduct allegedly took place over a period of several years, from approximately 1980 to the present. Even though each act of alleged mail fraud was itself necessarily "separate", these fraudulent acts were all allegedly intended to further an overall scheme to defraud the limited partners of COM–TECH. In essence, it is alleged they were all done in furtherance of a common goal. COMPUTER ASSOCIATES allegedly achieved the restructuring of the Marketing Agreement through separate fraudulent letters mailed to the limited partners of COM–TECH in 1979 and 1980. Although the letters are written by separate individual defendants, all are related to the same subject matter (the purported effect of the computer industry developments on the development of the COM–TECH program), with the same purpose and same victims (to defraud the limited partners of royalty payments). Furthermore, the plaintiffs allege that the scheme continued in 1981 and 1982 by concealing the true and accurate amount of receipts received from marketing the program, which scheme was carried out through the numerous fraudulent letters, royalty statements and royalty conciliation reports mailed to the individual limited partners.

In light of *H.J., Inc.,* it matters not that there is a single victim (the limited partners) and a single overall scheme to defraud (diversion or underreporting of royalties), so long as the scheme was carried out by the commission of two or more predicate acts and they are related and have some degree of continuity (*see, e.g., Polycast Technology Corp. v. Uniroyal, Inc., supra,* 728 F.Supp. at p. 948 [single injury to a single victim is sufficient to satisfy "pattern" element, where plaintiff alleged numerous securities law violations and mail and wire fraud as predicate acts]). Those allegations are present in this complaint. Accordingly, the plaintiffs have sufficiently pled a "pattern of racketeering activity" under section 1962 of RICO.

■ In this regard, the Court also rejects the defendants' argument that the plaintiffs failed to allege that the defendants' acquired and maintained an interest in an enterprise. Section 1962(b) makes unlawful the acquisition or maintenance of an interest, either directly or indirectly, in an enterprise through a pattern of racketeering activity. According to the Amended Complaint, the defendants maintained both a "direct" interest (as a general partner of COM–TECH) and an "indirect" interest (by acquiring, concealing and secreting partnership assets) in the enterprise. The Court finds this sufficient at the pleading stage.

*iv. Economic Injury From Each Predicate Act.*

■ The defendants allege that COM–TECH did not sustain economic injury as a result of one of the predicate acts, namely, the mailing of an October 26, 1979 letter, and therefore that act should not be permitted to stand as a predicate.

The defendants' argument, however, is without merit. Each act of mail fraud need not be an essential element of the fraudulent scheme; rather, "[i]t is sufficient for the mailing to be 'incident to an essential part of the scheme ... or a step in [the] plot' " (*Schmuck v. United States*, 489 U.S. 705, 109 S.Ct. 1443, 1447, 103 L.Ed.2d 734 [1989] [citations omitted]). In addition, section 1964(c) of RICO creates a private right of action for any person "injured in [their] business or property by reason of a violation of section 1962". The injury must result from the "pattern of racketeering activity", not necessarily from each isolated predicate act (*see Sedima, supra*, 473 U.S. at pp. 496–97, 105 S.Ct. at p. 3285). Accordingly, that argument and ground for dismissal is rejected.

### *v. Conspiracy.*

■ The defendants also seek dismissal of the third claim for relief, which alleges conspiracy to violate RICO under section 1962(d). Specifically, the defendants contend that the plaintiffs' incorporation by reference of the alleged fraud set forth earlier in the complaint is insufficient to allege conspiracy under RICO.

Section 1962(d) makes it unlawful to conspire to violate any of its substantive provisions. Although there need not be proof of overt acts to show a violation of section 1962(d), in order "[t]o state a claim for RICO conspiracy, plaintiff must allege that each defendant, by words or actions, manifested an agreement to commit two predicate acts in furtherance of the common purpose of the RICO enterprise" (*First City Nat'l Bank and Trust Co. v. FDIC*, 730 F.Supp. 501, 509 [E.D.N.Y.1990] [McLaughlin, J.]). Bare or conclusory allegations of participation in a conspiracy under 1962(d) will not avail on a motion to dismiss, and the plaintiff must plead allegations that each defendant knowingly agreed to participate in the conspiracy, particularly when the predicate acts alleged are fraud (*see Grunwald v. Bornfreund*, 668 F.Supp. 128, 133 [E.D.N.Y.1987]; *see generally* D. Smith & T. Reed, *Civil RICO* ¶ 7.02[6][a][ii] [1990]).

In attempting to plead a violation of section 1962(d) here, the plaintiffs have simply incorporated by reference the allegations as to the defendants' fraudulent scheme. The Amended Complaint then concludes that "[t]he defendants, and each of them, unlawfully, willfully and knowingly agreed and conspired to violate the provisions of 18 U.S.C. §§ 1962(b) and (c)" (Amended Complaint ¶ 103). Significantly absent from the pleading are any allegations of specific facts that each of the defendants, by words or actions, manifested an agreement to commit two or more of the predicate acts (*see Morin v. Trupin*, 711 F.Supp. 97, 111 [S.D.N.Y.1989]). Accordingly, the Court finds that the plaintiffs failed to state a viable claim under 18 U.S.C. § 1962(d), and therefore the defendants' motion to dismiss the third claim for relief alleging conspiracy to violate RICO, is granted.

(c) *Motion to Dismiss Claims Four through Fourteen (State–Law Claims):*

■ COMPUTER ASSOCIATES alleges that if the Court dismisses claims one, two and three (*i.e.*, the RICO causes of action), then the remaining eleven state-law claims must fall as well, since there is no independent basis of jurisdiction in the federal court.

Since the Court has not dismissed claims one and two, federal question jurisdiction exists (*see* 28 U.S.C. § 1331). While it is true that no independent basis for jurisdiction exists over the state-law claims since there is no diversity of citizenship (*see Carden v. Arkoma Assocs.*, ── U.S. ──, 110 S.Ct. 1015, 108 L.Ed.2d 157 [1990] [for purposes of diversity, a limited partnership is a "citizen" of each of the states that the partners, either limited *or* general, resides]), the Court nonetheless will exercise pendent jurisdiction over the state-law claims since they "derive from a common nucleus of operative fact" (*United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 [1966]). Therefore, the defendants' motion to dis-

miss claims four through fourteen, is denied.

(d) *Motion to Strike Allegations as to Punitive Damages:*

COMPUTER ASSOCIATES moves pursuant to Fed.R.Civ.Pro. 12(f) to strike COM–TECH's demand for punitive damages with regard to the RICO and common-law causes of action. COMPUTER ASSOCIATES argues that the plaintiffs may not seek punitive damages *in addition to* the treble damages that are available under RICO. In opposition, COM–TECH first alleges that COMPUTER ASSOCIATES' motion to strike under Rule 12(f) is not timely and, second, that in any event the allegations seeking punitive damages are proper with regard to both the RICO and common-law causes of action.

■ At the outset, the Court notes that Fed.R.Civ.P. 12(f) expressly provides that "upon the court's own initiative *at any time*", the Court may order matter stricken from a pleading (emphasis supplied). Thus, despite the plaintiffs' contention to the contrary, the Court plainly has the power to adjudicate this branch of the defendants' motion.

■ Although courts are divided with regard to the availability of punitive damages in a civil RICO action depending on whether the purpose of the treble damage award is viewed as either remedial or punitive (*see* D. Smith & T. Reed, *Civil RICO* ¶ 10.04 [1990] [collecting cases]), this Court is of the view that at least at the pleading stage, a claim for punitive damages should be permitted to stand, especially since the Supreme Court has held that civil RICO is primarily remedial in nature and only secondarily punitive (*see Shearson/American Express, Inc. v. McMahon, supra*). The Court makes no determination of its future course with regard to the availability of punitive damages in a civil RICO action (*cf. Holmberg v. Morrisette*, 800 F.2d 205, 211–12 [8th Cir.1986], *cert. denied*, 481 U.S. 1028, 107 S.Ct. 1953, 95 L.Ed.2d 526 [1987]; *Al–Kazemi v. General Acceptance & In-*

*vestment Corp.*, 633 F.Supp. 540, 543–44 [D.D.C.1986] ).

Apart from the RICO claims, the plaintiffs also seek punitive damages in connection with their common-law claims. Under New York law, punitive damages are available "for cases in which the defendant's conduct has constituted 'gross, wanton, or willful fraud or other morally culpable conduct' to an extreme degree" (*Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 371 [2d Cir.1988], quoting *Borkowski v. Borkowski*, 39 N.Y.2d 982, 983, 387 N.Y.S.2d 233, 233, 355 N.E.2d 287, 287 [1976] ). As a matter of pleading, therefore, it is proper for the plaintiffs here to request punitive damages in connection with their allegations of willful fraud.

Accordingly, the defendants' motion to strike the allegations of punitive damages is denied in all respects.

(e) *Motion for Summary Judgment based upon the Statute of Limitations:*

■ COMPUTER ASSOCIATES alleges that the statute of limitations on both the RICO and common-law claims has run, and accordingly moves for summary judgment. Of course, summary judgment may only be granted if it is demonstrated that there are no genuine issues of material fact for trial (*see* Fed.R.Civ.P. 56[c] ). "[T]he judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there does indeed exist a genuine issue for trial" (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 [1986] ).[3]

Statute of Limitations on the RICO Claims.

The applicable statute of limitations in a RICO action is four years (*see Agency Holding Corp. v. Malley–Duff and Assocs., Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 [1987] ). "[E]ach time a plaintiff suffers an injury caused by a violation

---

**3.** The standard for granting summary judgment is set forth in greater detail below in connection with the plaintiffs' motion for partial summary judgment (*see infra* at pp. 1082–83).

of 18 U.S.C. § 1962, a cause of action to recover damages based on that injury accrues to plaintiff *at the time he discovered or should have discovered the injury"* (*Bankers Trust v. Rhoades, supra,* 859 F.2d at p. 1102 [emphasis supplied]).

COMPUTER ASSOCIATES alleges that several of the limited partner plaintiffs were aware of a general fraudulent scheme more than four years before the filing of this action on September 30, 1987. Although COM–TECH acknowledges that some sort of "underhanded" activity may have been suspected more than four years prior to September 30, 1987 (*i.e.,* before September 30, 1983), it claims that it did not actually discover the *injury* until after that date, due to the difficulty in obtaining the financial records of COMPUTER ASSOCIATES.

In searching the record, the Court is of the view that there exist genuine issues of material fact as to when COM–TECH discovered or should have discovered the injury that occurred as a result of COMPUTER ASSOCIATES' alleged fraudulent activities.[4] This conclusion is further supported by the defendants' appeal from Magistrate Jordan's discovery ruling in which they are seeking additional discovery on precisely this issue.[5] "The question of whether a plaintiff should have reasonably discovered an alleged fraud does not easily lend itself to summary disposition and it is ordinarily a question left to the jury" (*Anisfeld v. Cantor Fitzgerald & Co.,* 631 F.Supp. 1461, 1466 [S.D.N.Y.1986] [citation omitted]). This Court agrees.

Statute of Limitations on Common–Law Claims.

COMPUTER ASSOCIATES also contends that claims four, and six through thirteen are barred by New York's fraud statute of limitations, which provides that an action based upon fraud must be commenced within six years of the commission of the fraud or two years of its discovery, *whichever is longer* (*see* CPLR 203[f]; CPLR 213[8]). Like the RICO cause of action, COM–TECH argues that the common-law fraud causes of action accrued at the earliest, October 1983, and at the latest, July 1984. Under either calculation, COM–TECH claims that the action was timely commenced on September 30, 1987.

Again, the Court finds that the conflicting contentions of the parties and evidence presented creates serious questions of material fact precluding summary judgment on the issue of COM–TECH's discovery of the fraud.

As to both the RICO and common-law claims, the issues of when COM–TECH discovered or should have discovered the fraud and also the resultant injury, are questions which should, and will, be left for the jury. Accordingly, the defendants' motion for summary judgment on the grounds that the action is barred by the applicable statute of limitations, is denied.

(2) COM–TECH'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE FOURTEENTH CLAIM FOR RELIEF

COM–TECH is seeking partial summary judgment solely on its fourteenth claim for relief, namely, breach of contract and breach of fiduciary duty on the part of COMPUTER ASSOCIATES with respect to a noncompetition clause contained in the Marketing Agreement.[6] It alleges that sometime after 1987, COMPUTER ASSOCIATES began marketing a tape library management program, which competes directly with the CA–DYNAM/T–OS program in the Marketing Agreement. In opposition, COMPUTER ASSOCIATES alleges that issues of fact exist as to the meaning and import of the noncompetition clause, as well as whether there in fact exists a fiduciary relationship between the

---

4. Although counsel for the defendants eventually conceded at oral argument that questions of fact did exist on this issue, this branch of the defendants' motions was never actually formally withdrawn.

5. *See infra* at pp. 1086–87.

6. It is undisputed that New York law governs the parties' relationship under the Marketing Agreement (*see* Marketing Agreement § H, ¶ 5, at p. 16).

parties and, if so, whether a fiduciary duty has been breached.

Standard on a Motion For Summary Judgment.

A party is entitled to judgment as a matter of law if it is shown that there are no genuine issues of material fact for trial (*see* Fed.R.Civ.P. 56[c]; *Anderson v. Liberty Lobby, Inc., supra*, 477 U.S. at p. 248, 106 S.Ct. at p. 2510). The Court must, however, resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion (*see Magnotti v. Kuntz*, 918 F.2d 364 [2d Cir.1990]; *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 [2d Cir.1986], *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 [1987]). "Summary judgment is proper when reasonable minds could not differ as to the import of the evidence before the court" (*Cable Science Corp. v. Rochdale Village, Inc.*, 920 F.2d 147, 151 [2d Cir. 1990]).

In opposing a motion for summary judgment, the non-movant bears the burden to come forward with specific facts showing that a genuine issue for trial exists (*see National Union Fire Ins. Co. v. Turtur*, 892 F.2d 199, 203 [2d Cir.1989]). "Mere conclusory allegations or denials will not avail a party resisting summary judgment" (*Cassells v. University Hosp. at Stony Brook*, 740 F.Supp. 143, 146 [E.D.N.Y. 1990]). The Court's function, of course, is to *find* issues, not *resolve* them (*see Eye Assocs., P.C. v. IncomRx Sys. Ltd.*, 912 F.2d 23, 27 [2d Cir.1990]).

In *Cable Science Corp. v. Rochdale Village, Inc.*, 920 F.2d 147 (2d Cir.1990), the Second Circuit recently reiterated the applicable standard on a summary judgment in the context of a contractual dispute, as follows:

"In determining a motion for summary judgment involving the construction of contractual language, a court should accord that language its plain meaning giving due consideration to 'the surrounding circumstances [and] apparent purpose which the parties sought to accomplish.' *William C. Atwater & Co. v. Panama*

*R.R. Co.*, 246 N.Y. 519, 524, 159 N.E. 418 (1927); *see also National Union Fire Insurance Co. v. Turtur*, 892 F.2d 199, 205 (2d Cir.1989) ('Questions of intent, we note, are usually inappropriate for disposition on summary judgment').

Because in a contract dispute, intent is all, the language used must be examined first to see if it is ambiguous. *See Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 27 (2d Cir.1988); *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 NY2d 456, 460, 161 N.Y.S.2d 90, 141 N.E.2d 590 (1957). Here both parties moved for summary judgment and also took the position that the language of the contract was unambiguous. Nonetheless, in order for a district court to grant summary judgment in such a case, there may not be any genuine issue regarding the inferences to be drawn from the language. Hence, the inferences to be drawn from the language used may not be reasonably susceptible to having more than one meaning ascribed to them. *See Schwabenbauer v. Board of Education of Olean*, 667 F.2d 305, 313 (2d Cir.1981). It is only where the language *and* the inferences to be drawn from it are unambiguous that a district court may construe the contract as a matter of law and grant summary judgment accordingly. *American Home Assurance Co. v. Baltimore Gas & Elec. Co.*, 845 F.2d 48, 50–51 (2d Cir.1988)" (920 F.2d at 151).

See also *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir.1990); *Pantone v. Esselte Letraset, Ltd.*, 878 F.2d 601, 605–06 (2d Cir.1989).

In determining whether an ambiguity exists here, the Court is guided by the following principles:

"[a]n 'ambiguous' word or phrase is one capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business" (*Pantone v. Esselte Letraset, Ltd., supra*, 878 F.2d at p. 606,

quoting *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F.Supp. 987, 994 [S.D.N.Y.1968] ).

Relevant Facts and the Parties' Contentions.

The noncompetition clause contained in the Marketing Agreement provides the following:

> "*Non-compete.* During the term of this Agreement, [COMPUTER ASSOCIATES] agrees that it will not engage in the promotion, marketing, distribution, sale or licensing of any computer software program or system other than the Product *which competes directly* with the Product in that it *performs the same functions* as the Product *and that it is compatible with the same computer hardware equipment and operating system* as the Product" (Marketing Agreement § A, ¶ 5(e), at p. 5 [emphasis supplied] ).[7]

In August 1982, COMPUTER ASSOCIATES acquired Capex Corporation, a distributor of computer software systems, which then produced a product known as "TLMS II"—also a computer tape library management system for the OS operating system. COMPUTER ASSOCIATES began computing royalties owed to COM-TECH based on earnings from the CA-DYNAM/T-OS as well as the TLMS II program. Eventually, the two programs were combined and called "CA-DYNAM/TLMS", and COMPUTER ASSOCIATES ceased marketing the original CA-DYNAM/T-OS program.

Although the original CA-DYNAM/T-OS program operated solely on the OS and OS/VS systems, the new CA-DYNAM/T-OS program operated on *both* the OS/VS *and* MVS operating systems. COMPUTER ASSOCIATES continued to pay to the COM-TECH partners royalties derived from the marketing and licensing of the CA-DYNAM/TLMS program.

Sometime in 1988, after the commencement of this suit and during discovery, it was revealed that COMPUTER ASSOCIATES, in its Pricing Handbook and Software Guide, was marketing a tape library management product known as "CA-1", which was formerly a program called "UCC-1". This program was acquired upon COMPUTER ASSOCIATES' merger with the UCCEL Corporation in August 1987. COMPUTER ASSOCIATES concededly markets and licenses the CA-1 program which, according to defendant Charles Wang, "address[es] the same markets and provide[s] solutions to the same user needs" as the CA-DYNAM/TLMS (Wang Aff't ¶ 17), but operates *only* on the MVS operating system[8] and not the OS/VS system. As of August 31, 1988, COMPUTER ASSOCIATES has apparently received approximately $15 million attributable to the licensing and maintenance of the CA-1 program.

COM-TECH alleges in its fourteenth claim for relief that COMPUTER ASSOCIATES' licensing and maintenance of the CA-1 is a breach of the noncompetition clause in the Marketing Agreement (*see* Amended Complaint ¶¶ 125–132). Specifically, COM-TECH alleges that COMPUTER ASSOCIATES breached the Marketing Agreement by licensing and maintaining the CA-1 and refusing to pay COM-TECH royalties for such use. COM-TECH alleges that the CA-1 performs the same functions as the CA-DYNAM/TLMS, for the following reasons: (1) COMPUTER ASSOCIATES' own description of the CA-1 in its Software Guide show that the two products perform essentially the same functions; (2) defendant Charles Wang, Chief Executive Officer of COMPUTER ASSOCIATES testified in his deposition that the two perform "the same basic functions"; (3) the prices of the two programs are identical; and, (4) the Pricing Handbook and Software Guide show that both programs are marketed as "identical twin" programs—that is, the two are listed as interchangeable programs.

COM-TECH alleges that not only does this constitute a breach of contract, but also a breach of fiduciary duty, since by

---

**7.** The "Product" referred to in the noncompetition clause is the CA-DYNAM/T-OS program.

**8.** "MVS" stands for "Multiple Virtual Storage".

the terms of the Marketing Agreement COMPUTER ASSOCIATES is an "exclusive distributor" of COM–TECH's product, and also that COMPUTER ASSOCIATES is to use its "best efforts" to promote the program. As a result of the alleged breach of fiduciary duty, COM–TECH is requesting the Court to direct COMPUTER ASSOCIATES to disgorge all profits, and also to impose a constructive trust.

In opposition to COM–TECH's motion, COMPUTER ASSOCIATES raises the following: (1) the dispute concerning the non-payment of royalties as to the CA–1 program is subject to compulsory arbitration pursuant to the partnership agreement between the parties;[9] (2) there are triable issues of material fact as to whether the marketing of the CA–1 program constitutes a breach of the Marketing Agreement. Further, the defendants contend the non-competition clause is at best ambiguous, and therefore it is improper for the Court to grant summary judgment; and, (3) even assuming COMPUTER ASSOCIATES has breached the Marketing Agreement, COM–TECH is not entitled to a constructive trust, nor is it entitled to any profits derived from the CA–1, but only royalties as computed under the Marketing Agreement.

Construction of the Non–Competition Clause.

The Court must first determine whether the plain language of the non-competition clause is unambiguous as a matter of law and, if so, whether or not any inferences drawn therefrom are also without ambiguity as a matter of law. If the Court finds the non-competition clause itself or any inferences to be drawn therefrom to be ambiguous, then summary judgment must be denied (see *Cable Science Corp. v. Rochdale Village, Inc., supra*). If, however, the Court finds both the clause and inferences unambiguous as a matter of law, then the next determination is whether there exists genuine issues of material fact

as to whether or not COMPUTER ASSOCIATES has in fact breached this clause.

By its express terms, the non-competition clause prevents COMPUTER ASSOCIATES from engaging in the "promotion, marketing, distribution, sale or licensing of any computer software program which *competes directly* with" the CA–DYNAM/T–OS product (Marketing Agreement § A, ¶ 5(e), at p. 5 [emphasis supplied]). The phrase "competes directly", specifically means that the competing program "performs the same functions ... and that it is compatible with the same computer hardware equipment *and operating system*" as the CA–DYNAM/T–OS program (Marketing Agreement § A, ¶ 5(e), at p. 5 [emphasis supplied]).

It appears that COMPUTER ASSOCIATES concedes that the CA–1 program does in fact perform the same functions as COM–TECH's program. What is sharply disputed between the parties, however, is whether the CA–DYNAM/TLMS program comes within the coverage of the Marketing Agreement and also whether COMPUTER ASSOCIATES' CA–1 program is compatible with the *same operating system* as the CA–DYNAM/T–OS or CA–DYNAM/TLMS programs. Both parties have offered numerous affidavits and voluminous technical material on these issues, most of which are conflicting in material respects.

Although it is undisputed that the CA–DYNAM/TLMS and CA–1 programs "address the same markets and provide solutions to the same user needs" (Wang Aff't ¶ 17), the Court finds that the language of the noncompetition clause itself, as well as inferences to be drawn therefrom, contain ambiguities that preclude partial summary judgment on the plaintiffs' fourteenth claim for relief. Specifically, genuine material issues exist as to whether the CA–DYNAM/TLMS program (*i.e.*, the "successor" program of the CA–DYNAM/T–OS program), is in fact considered "the Product" within the meaning of the noncompeti-

---

**9.** Whether or not this dispute is subject to compulsory arbitration is part of the relief sought by COMPUTER ASSOCIATES in its motion to dis-

miss, which was considered and denied by the Court above (*see supra* at pp. 1072–75).

tion clause of the Marketing Agreement. The Marketing Agreement itself expressly refers to the "Tape Management System for OS and OS/VS Users" (*see* Marketing Agreement, Exhibit 1), and not the MVS system, but the CA–DYNAM/TLMS operates on both. In this Court's view, it cannot be said as a matter of law that the CA–DYNAM/TLMS is "the Product" referred to in the Marketing Agreement.

In this regard, the Court also notes that the plaintiffs submitted an affidavit from Philip K. Hills, Jr., Esq., the attorney who drafted the Marketing Agreement, who unequivocally stated the following:

> "I used broad language for the non-compete clause because I was not familiar with computers or the computer business and could not predict the specific activities in which Computer Associates could engage that would compete with our product" (Hills Aff't ¶ 7).

Thus, even according to the draftsman of the clause, there is an obvious ambiguity as to whether the phrase "same operating system" was intended to encompass *both* the OS/VS *and* MVS operating systems. In fact, without resorting to extrinsic evidence, it could arguably appear to the contrary, namely, that the phrase "same operating system" refers only to programs that operate on the OS/VS system, and not the MVS system.

The plaintiffs also rely on the "history of dealings among the parties to this litigation, Computer Associates' own documents, industry usage, IBM's usage of the terms that it invented, the sworn testimony of Computer Associates employees who worked on the program, as well as Mr. Wang's sworn testimony and his own affidavit" (Plaintiffs' Reply Memorandum of Law at p. 4). This array of documents and factual assertions only serves to underscore the Court's conclusion that ambiguities exist as to the plain meaning of the noncompetition clause.

Accordingly, based upon the foregoing, the Court cannot conclude that the noncompetition clause is without ambiguity or whether COMPUTER ASSOCIATES' marketing and licensing of the CA–1 program breaches that provision of the Marketing Agreement, as a matter of law. Accordingly, the motion of the plaintiffs for partial summary judgment on the fourteenth claim for relief, is denied. Since the Court cannot conclude as a matter of law that COMPUTER ASSOCIATES breached the noncompetition provision of the Marketing Agreement, the Court need not, and does not, reach the issue of whether there exists a fiduciary relationship and, if so, whether a fiduciary duty was breached.

### (3) COMPUTER ASSOCIATES' MOTION FOR REVIEW OF MAGISTRATE JORDAN'S DISCOVERY ORDER

■ The defendants seek review of a discovery ruling issued by United States Magistrate Judge David F. Jordan, which denied COMPUTER ASSOCIATES' motion to compel production of certain documents. For the reasons set forth below, Magistrate Jordan's order is affirmed in all respects.

During the course of discovery, COM–TECH refused to produce certain documents on the ground that they were protected by the attorney-client privilege. Over one year later, COMPUTER ASSOCIATES made a motion before Magistrate Jordan to challenge the privilege, *inter alia*, on the grounds that the documents were necessary to prove the defense of statute of limitations on the RICO and common-law fraud claims. Magistrate Jordan thereafter conducted an *in camera* inspection of the documents, and denied COMPUTER ASSOCIATES' motion to compel as to every document, except one, concluding that the documents were "irrelevant" on the issue of statute of limitations (*see Com–Tech Assocs. v. Computer Assocs. Int'l, Inc.*, CV–87–3355 [DFJ], slip op. at p. 4 [E.D.N.Y. Aug. 24, 1989]). After his *in camera* review, Magistrate Jordan concluded that the documents did not "contain any information, or leads thereto, which would be helpful to the defendants" on the statute of limitations defense (*id.*). COMPUTER ASSOCIATES now seeks review of that discovery ruling pursuant to Rule 5 of the Standing Orders of the Court on Effec-

tive Discovery in Civil Cases in the Eastern District of New York ("Standing Orders").

According to Rule 5(a) of the Standing Orders, "[a] party may make application to the judge to review a ruling of the magistrate on a discovery matter pursuant to Fed.R.Civ.P. 72(a)". Under Rule 72(a), governing nondispositive matters that are referred to a Magistrate, the Court "shall modify or set aside any portion of the magistrate's order found to be clearly erroneous or contrary to law" (Fed.R.Civ.P. 72[a]; *see also* 28 U.S.C. § 636[b][1][A] [district court may reconsider Magistrate's finding if "clearly erroneous or contrary to law"]). This, of course, is a lesser standard of review than when the Court is asked to review a dispositive motion subject to *de novo* review (*see* Fed.R.Civ.P. 72[b]).

Discovery rulings by a Magistrate are considered nondispositive (*see Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 [2d Cir.], *cert. denied sub nom. Greenspan, Jaffe & Rosenblatt v. Sara Lee Corp.*, — U.S. —, 111 S.Ct. 132, 112 L.Ed.2d 100 [1990]), and are thus reviewed under the "clearly erroneous" or "contrary to law" standard. Since Magistrates are considered to have broad discretion over nondispositive matters (*see Aries Ventures Ltd. v. Axa Finance S.A.*, 696 F.Supp. 965, 966 [S.D.N.Y.1988]), a party seeking to overturn a discovery ruling generally bears a "heavy burden" (*see Citicorp v. Interbank Card Ass'n*, 87 F.R.D. 43, 46 [S.D.N.Y.1980]).

It is with these principles in mind that the Court, by order dated April 27, 1990, directed COM–TECH to produce for an *in camera* inspection, all of the documents provided to Magistrate Jordan to determine whether they are relevant to the statute of limitations defense.

Upon *in camera* review of all of the documents submitted, the Court cannot conclude that Magistrate Jordan's discovery ruling was either clearly erroneous or contrary to law. In this Court's view, the documents are not material or relevant to a determination of whether COM–TECH discovered or should have discovered the

alleged fraud four or six years prior to the commencement of this action on September 30, 1987. Accordingly, the order of Magistrate Jordan, dated August 24, 1989, is affirmed in all respects.

## III. CONCLUSION

Based upon the foregoing, the motions are decided as follows:

(1) The motion of the defendants to compel arbitration is denied;

(2) The motion of the defendants for judgment on the pleadings on claims one and two is denied;

(3) The motion of the defendants for judgment on the pleadings on claim three is granted;

(4) The motion of the defendants to dismiss claims four through fourteen is denied;

(5) The motion of the defendants to strike the allegations of the complaint as to punitive damages is denied;

(6) The motion of the defendants for summary judgment based on the defense of statute of limitations is denied;

(7) The motion of the plaintiffs for partial summary judgment on the fourteenth claim for relief is denied; and,

(8) The discovery order of Magistrate Jordan dated August 24, 1989, is affirmed in all respects.

The parties are directed to attend a conference in Chambers on Thursday, January 31, 1991, at 8:00 a.m., in room 210 of the United States Courthouse, Uniondale Avenue at Hempstead Turnpike, Uniondale, New York, to set a final scheduling order and trial date. In the interim, counsel for the plaintiffs shall contact Chambers to arrange to obtain the documents that were submitted for the Court's *in camera* review.